CLAUDE NEON LIGHTS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59391. Promulgated February 10, 1937.

*Raymond M. White, Esq.*, for the petitioner.
*James K. Polk, Jr., Esq.*, and *John H. Pigg, Esq.*, for the respondent.

OPINION.

*Nature of rights granted.*—The respondent argues that the patent rights granted were licenses as distinguished from assignments or other species of rights which might be considered as exchangeable property under the exchange and reorganization provisions of the statute. The general rule laid down by the cases is that the granting of an exclusive right to manufacture, use, and vend under a patent in a specified territory vests *pro tanto* title to the patent itself in the grantee. *Gayler* v. *Wilder*, 10 How. 486, 493; *Bloomer* v. *Mc-Quewan*, 14 How. 539, 548; *Waterman* v. *Mackenzie*, 138 U. S. 252, 255; *Crown Co.* v. *Nye Tool Works*, 261 U. S. 24, 37. The same legal effect follows from a grant of all right, title, and interest for a specified territory. *Nicolson Pavement Co.* v. *Jenkins*, 14 Wall. 452; *Railroad Co.* v. *Trimble*, 10 Wall. 367. In the case before us some of the grants of rights under the patent are termed licenses, but this is not determinative of the interest conveyed. This is plainly brought out in *Waterman* v. *Mackenzie*, *supra*, where it is said:

Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions.

Whether a transfer is an assignment or license depends upon the effect of the whole contract. 48 C. J. § 370. The case before us involves the granting of patent rights to each of eight corporations in specified territory. The several grants are variously phrased, but, upon an examination of them we conclude that each was intended to, and did grant the exclusive right to make, use, and vend the patented articles in a specified territory for the full term of the patents. They

were therefore assignments. As such, the grants were property susceptible of exchange within the meaning of the taxing statutes.

We may also say at this point that each of the several transactions hereinafter considered was a genuine business deal, engaged in for the purpose of developing petitioner's business under its patents, and they are not open to the charge of being shams entered into to avoid tax, as in *Gregory* v. *Helvering*, 293 U. S. 465.

### FINDINGS OF FACT.

### Transactions in Which Petitioner Acquired Stock.

*1. Bellows Corporation.*—This was a Michigan corporation, organized in 1926 with an authorized capital stock of 15,000 shares of preferred stock of $100 per share par value and 45,000 shares of no par value common stock. It was organized pursuant to a contract entered into on June 25, 1926, between the petitioner, L. F. R. Bellows & Co., a partnership, and W. T. P. Hollingsworth. It was agreed therein that upon incorporation of the Bellows Corporation the petitioner would assign to it exclusive rights under its Claude patents in the States of Michigan, Ohio, and Indiana. The partnership agreed to transfer to the Bellows Corporation all of the partnership assets then being used in the electric sign business except real estate, contracts, cash, and receivables. Hollingsworth agreed that he would procure cash subscriptions to stock of the Bellows Corporation in the sum of $300,000. It was further provided that the subscribers for the 3,000 shares of preferred stock to be procured by Hollingsworth should receive as a bonus two shares of common stock with each share of preferred purchased.

On June 28, 1926, the petitioner formally granted to the new corporation the exclusive right to manufacture, use, and sell the Claude inventions in the aforesaid three states. On October 21, 1926, a formal transfer of the partnership assets was made to the new corporation in accordance with the June agreement. By that time Hollingsworth had procured the subscriptions to the stock of the new corporation in accordance with the June agreement, and $90,000 cash had been paid in on the subscriptions. Stock of the Bellows Corporation was issued on October 21, 1926, as follows:

| Issued to— | Preferred stock | Common stock |
|---|---|---|
| | *Shares* | *Shares* |
| Petitioner | 1,650 | 6,000 |
| Bellows partners | 1,650 | 6,000 |
| Outside interests | 3,000 | 6,000 |

The balance due on the cash subscriptions was all paid in prior to September 1927.

On organization of the Bellows Corporation the three partners became its only officers. The partnership thereafter continued in existence for the purpose of holding real estate.

About December 1, 1927, 6,300 additional shares of preferred stock were issued by the Bellows Corporation for cash and 12,600 shares of common stock were issued as bonus stock with the preferred. Most of this stock was taken by the original holders.

The stock of the Bellows Corporation received by the petitioner had a fair market value of $206,000 at the time of receipt.

OPINION.

Petitioner claims that the Bellows transaction was nontaxable on two grounds: First, that there was an exchange of property solely for stock of a corporation and immediately after the exchange the transferors were in control of the transferee corporation; second, that property was exchanged pursuant to a plan of reorganization solely for stock in another corporation a party to the reorganization.

The second ground is plainly without merit. The transaction meets none of the requirements of the definition of reorganization in section 203 (h) (1) of the Revenue Act of 1926.[1] There was no merger or consolidation; no acquisition by either corporation of stock or assets as prescribed by the parenthetical clause; there was no transfer of assets by either corporation followed by control in the transferor; there was no recapitalization, or mere change in identity, form or place of reorganization.

The first ground urged is put forth under section 203 (b) (4),[2] which, in brief, provides for the nonrecognition of gain or loss upon the transfer of property to a corporation solely for stock or securities of the corporation if immediately after the exchange the transferors of the property are in control of the corporation through the owner-ship of at least 80 percent of each class of stock. Where two or more persons exchange property for stock, nonrecognition is granted only if the amount of stock received by each is substantially in proportion to his interest in the property before the exchange.

---

[1] Sec. 203. (h) (1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferer or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

[2] Sec. 203. (b) (4) No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

The facts here are similar to those in *Halliburton* v. *Commissioner*, 78 Fed. (2d) 265, in which a partnership exchanged property for stock in a new corporation, and a group of corporations paid in cash for stock of the new corporation. In that case the court pointed out that the statute (sec. 203 (b) (4), Revenue Act of 1924, which is the same as the corresponding section of the 1926 Act) does not expressly exclude money from consideration, and that in other court decisions money has been held to be "property." It is further pointed out that under other sections of the exchange provisions care is taken to specify the particular kind of property intended to be excluded from the generic term. For instance, section 204 (a) (6) uses the expression "property (other than money", and subsections (7) and (8) use the expression "property (other than stock or securities * * *)." The opinion proceeds:

Not only is the word "property" used in said paragraph (4) without qualification, but no apparent reason suggests itself why money paid for stock should not be considered property within the contemplation of that provision of the statute. * * * In addition to other capital assets corporations engaged in business require money. In the instant case the partnership had developed a valuable business based largely upon the ownership of a patented process for cementing oil wells. Their patrons necessarily included, doubtless largely, corporations engaged in the oil industry. Apparently there was a field open for the expansion of the business which required a larger money capital. Such expansion could be to the benefit of the oil industry generally, and the oil companies purchasing stock in particular, in the event the demand was in excess of the ability of the partnership as such to supply. We think it clear that the statute comprehends a situation such as presented in the instant case where certain persons transfer to a corporation certain property and property rights, other than money, while others transfer money only, and stock in the corporation is issued in exchange for such transfers.

The reasoning in the *Halliburton* case is applicable here, and the payment in of money for stock is to be regarded as an exchange of property for stock. There is no question here as to whether or not the amount of stock acquired was in proportion to the interests of the transferors in the property prior to the exchange. The parties have stipulated that in any of the transactions here involved which are held to be exchanges, such as we hold this to be, the stock received was substantially in proportion to the respective interests of the transferors.

FINDINGS OF FACT.

2. *Claude Neon Federal Co.*—This company, hereinafter called the new Federal Co., was chartered under the laws of Delaware in 1927. It was organized by the Federal Electric Co., hereinafter called the old Federal Co., a New York corporation, engaged in the business

of manufacturing electric signs and specialties. Its principal office was at Chicago, Illinois.

The purpose of organizing the new Federal Co. was to acquire from the petitioner the exclusive right under its Claude patents to manufacture, use, sell, or rent neon signs in a group of midwestern states. Contracts covering the details of the arrangements were entered into under dates of June 1 and July 14, 1927.

In accordance with the agreements the new Federal Co. was organized with an authorized capital of 50,000 shares of common stock and 25,000 shares of preferred. The preferred had no voting rights. The petitioner on July 14, 1927, transferred to the new Federal Co. the exclusive right to manufacture, use, sell, and rent the inventions covered by the Claude patents in sixteen midwestern states. The new Federal Co. issued to the petitioner 20,000 shares of its common and 3,333 shares of its preferred stock. The petitioner, in accordance with its agreement, assigned 13,334 shares of the common stock (13,333 on August 20, 1927, and 1 share on April 23, 1931) to the old Federal Co. Capital for the new company was to be supplied by the old Federal Co. through stock purchases. The old Federal Co. was to buy 5,000 shares of preferred stock for cash at $100 per share, of which 1,000 shares were to be purchased, and were so purchased, on July 14, 1927. The balance of the 5,000 shares were to be purchased on notice to be given by the new Federal Co. On completion of purchase of the 5,000 shares the old Federal Co. was to have an option to acquire an additional 1,667 shares of preferred at $100 per share. The preferred stock was issued to the old Federal Co. as follows, including the initial issue of 1,000 shares:

| Date | Shares | Date | Shares |
|------|--------|------|--------|
| July 14, 1927 | 1,000 | July 25, 1928 | 1,000 |
| September 27, 1927 | 1,200 | April 1, 1929 | 1,467 |
| December 31, 1927 | 1,000 | | |
| April 23, 1928 | 1,000 | Total | 6,667 |

It was contemplated by the parties, and provided in the agreement between them, that upon completion of the stock issue the petitioner would have a one-third interest in the new Federal Co. and the old Federal Co. would have a two-thirds interest. The officers of the new Federal Co. were all officers of the old Federal Co.; none of them were officers of the petitioner.

The stock of the new Federal Co. received by petitioner had a fair market value at the time of receipt of $339,967.

### OPINION.

The Federal Co. transaction in our opinion, comes within section 203 (b) (4) of the Revenue Act of 1926 [3] as a nontaxable exchange

---

[3] See footnote No. 2, *supra*.

of property for stock, followed by control of the new corporation by the transferors. Under the decision in *Halliburton* v. *Commissioner*, 78 Fed. (2d) 265, the cash paid in by the old Federal Co. is to be considered as property exchanged for stock. On completion of the transaction the petitioner and the old Federal Co. were in control of the new corporation through ownership of all the stock which they had acquired in exchange for property. Under the stipulation above referred to, the stock of the new Federal Co. is to be treated as being held in substantial proportion to the respective interests of the transferors in the property prior to the exchange. This state of facts brings the transaction within section 203 (b) (4), and we accordingly hold that no gain is to be recognized on the petitioner's exchange of patent rights for stock of the new Federal Co.

FINDINGS OF FACT.

3. *Claude Neon Displays, Inc.*—This company, hereinafter called the Displays Co., was incorporated under the laws of New York on July 13, 1928. Its authorized capital consisted of 10,000 shares of preferred stock of a par value of $100 per share, and 25,000 shares of no par common stock.

On July 13, 1928, the Displays Co. entered into a contract with Frazier-Wilson, Inc., which was then engaged in the manufacture and sale of advertising displays and signs. On July 16, 1928, the Displays Co. entered into a contract with the petitioner. Pursuant to these contracts the Displays Co. acquired (a) all the assets of Frazier-Wilson, Inc., and (b) exclusive rights under the Claude patents in the western part of New York State, the limits of the territory being described in the contract of July 16. The assets of Frazier-Wilson, Inc., were acquired in exchange for 1,150 shares of preferred stock and 5,300 shares of common stock of the Displays Co., certificates for which were issued, dated July 13, 1928. The 5,300 shares of common were first to go to the petitioner and then to be transferred to Frazier-Wilson, Inc., or its stockholders. The patent rights were acquired from petitioner for 2,000 shares of preferred stock and 19,000 shares of common stock of the Displays Co. to be issued to petitioner or its nominees. Petitioner did not actually receive the full 19,000 common shares called for by the contract. The 5,300 shares mentioned above were, by petitioner's direction, issued to Frazier-Wilson, Inc., which in turn distributed that stock and the 1,150 shares of Displays Co. preferred stock among its shareholders. Frazier-Wilson, Inc., then dissolved. Another block, 7,700 shares, of the 19,000 shares, was by petitioner's direction issued as a bonus to purchasers of 2,850 shares of the preferred stock of the Dis-

plays Co. The 2,850 shares of preferred stock were purchased at par. Subscriptions for this block of preferred stock were in hand by July 16, 1928.

Upon conclusion of the above steps, all of which were completed in July 1928, the outstanding stock of the Displays Co. was held as follows:

| Stockholder | Preferred stock | Common stock |
|---|---|---|
| | Shares | Shares |
| Petitioner | 2,000 | 6,000 |
| Frazier-Wilson, Inc., stockholders | 1,150 | 5,300 |
| Cash subscribers | 2,850 | 7,700 |
| Total | 6,000 | 19,000 |

The preferred stock had no voting rights except on default of dividends. The stock of the Displays Co. received by petitioner in the above transaction had a fair market value of $206,000 at the time of receipt.

OPINION.

The petitioner argues that in the Displays Co. transaction it was a "party to a reorganization" exchanging property "solely for stock" of the Displays Co., which was "a party to the reorganization", hence the transaction was within section 112·(b) (4) of the Revenue Act of 1928.[4]

It is clear that there was a reorganization in this transaction in so far as Frazier-Wilson, Inc., and the Displays Co. are concerned. The transfer of Frazier-Wilson assets for stock, followed by dissolution of the Frazier-Wilson Co., was a merger. It is equally clear that petitioner, "in pursuance of the plan of reorganization", exchanged property solely for stock of the Displays Co.

The only question remaining on this transaction is whether or not petitioner can qualify as "a party to a reorganization." No comprehensive definition of this term has been given in the cases. The statutory description (sec. 112 (i) (2)) is not by its term all-inclusive and we have so held. See *Fifth Avenue Bank of New York, Executor*, 31 B. T. A. 945, affd., 84 Fed. (2d) 787; *Independent Oil Co.*, 35 B. T. A. 32. But see *Commissioner* v. *Groman*, 86 Fed. (2d) 670, holding contra. On a finding that there was a reorganization, the determination of which corporations were parties to it must depend on all the facts and circumstances surrounding the transaction. The statute does not make the answer dependent on any particular mode of

[4] SAME—GAIN OF CORPORATION.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

participation or any specific amount of stock ownership by any of the participants. In this case, as we have pointed out, there was a reorganization in the merger of Frazier-Wilson, Inc., and the Displays Co. It was effected at the instance of petitioner and for the purpose of enlarging the scope of petitioner's operations. The petitioner was in a very substantial way a party to the deal; in fact, the acquisition by the Displays Co. of patent rights from the petitioner was an indispensable element of the transaction. The petitioner emerged from the "reorganization" with a substantial block of stock. In our opinion, on the facts here, the petitioner must be held to have been "a party to a reorganization." Thus it meets all the requirements of section 112 (b) (4), and the gain on the exchange of patent rights for stock is not to be recognized.

FINDINGS OF FACT.

.4. *Elliott Claude Neon Lights, Inc.*—This corporation was organized in 1928 under the laws of Florida, with an authorized capital of 3,000 shares of preferred stock of a par value of $100 per share, and 10,000 shares of no par common stock. It was organized by E. B. Elliott and the petitioner pursuant to a contract between them, dated June 20, 1928. It was to acquire, and did acquire, from the E. B. Elliott Advertising Co., a Florida corporation, the latter's electrical sign business, including all assets and good will. It was also to acquire, and did acquire, from the petitioner exclusive rights to make, use, and sell devices under the Claude patents in the State of Florida. The petitioner also agreed to provide a neon tube plant for the new corporation.

Pursuant to the preorganization agreement, the patent rights were granted by petitioner to the new corporation, hereinafter called the Elliott Co., on July 17, 1928. On the same date the Elliott Advertising Co. transferred to the Elliott Co. the assets as provided in the contract of June 20. At the same time the Elliott Co. issued to the petitioner 1,000 shares of its preferred stock and 2,000 shares of its common stock. At the same time the Elliott Co. issued 8,000 shares of its common stock to E. B. Elliott, who at the same time transferred 4,500 shares back to the Elliott Co. It was provided in an agreement between Elliott and the Elliott Co. that, of the stock so transferred, 2,000 shares were to be issued as a bonus, with 1,000 shares of preferred stock to be sold to outside interests at a price of $100 per unit of one share of preferred and two shares of common stock. In the agreement of June 20, 1928, the petitioner had contracted to procure subscriptions for this stock. The subscriptions were obtained about the time the new corporation was formed, and

the stock was issued to the cash subscribers some weeks later, about September 1928. Of the remaining shares transferred back by Elliott, 1,000 shares were to be disposed of "for the purpose of securing additional capital" or "other corporate purposes" and when it was issued the remaining 1,500 shares were to be issued to Elliott and the petitioner in equal amounts.

The stock of the Elliott Co. received by the petitioner had a fair market value of $102,000 when received.

### OPINION.

Petitioner contends that the Elliott deal was a nontaxable exchange under either section 112 (b) (5) or section 112 (b) (4) of the Revenue Act of 1928.

This transaction is very similar to the one last discussed—the Displays Co. matter. There was a reorganization as between the Elliott Advertising and the new Elliott Co. in that the new company acquired for stock all the assets of the old. The petitioner was in a very substantial way a party to the reorganization through the granting of patent rights for stock of the new company. The transaction meets all the requirements of section 112 (b) (4) and we hold that no gain is to be recognized to the petitioner on receipt of the Elliott Co. stock. It is unnecessary to decide whether the transaction might also come within section 112 (b) (5).

### FINDINGS OF FACT.

5. *Alpha Claude Neon Corporation.*—This corporation, hereinafter called Alpha Neon, was organized in Pennsylvania on July 12, 1928, pursuant to an agreement of June 22, 1928, between petitioner and the Alpha Sign Co., a Pennsylvania corporation. Alpha Neon was organized for the purpose of taking over the assets of the Alpha Sign Co. and manufacturing and selling neon signs under petitioner's neon patents in certain western counties of Pennsylvania and Maryland and the whole of the State of West Virginia. The agreement was carried out in all respects and stock was issued as hereinafter set out.

Alpha Neon's authorized stock consisted of 13,457 shares of preferred stock, par $100, without voting rights, and 46,914 shares of common without par value. The Alpha Sign Co. conveyed its assets to Alpha Neon in August 1928 for stock of Alpha Neon as follows: 2,472.8 shares of preferred and 4,945.6 shares of common, which were issued to the holders of Alpha Sign Co. preferred stocks; 3,457 shares of preferred and 18,164 shares of common, of which the preferred

shares and 6,914 common shares were issued to the holders of Alpha Sign Co. common stock, 7,500 shares of the new common stock went to the president of the Alpha Sign Co., and the rest, 3,750 shares, was returned to the treasury of Alpha Neon for use as bonus stock on the sale of its preferred shares.

The petitioner on August 29, 1928, granted to Alpha Neon the exclusive right to make, use, and sell devices under the Claude patents in the aforesaid territory and it received therefor 2,500 shares of Alpha Neon preferred and 23,750 shares of common. Of the common stock so received it was understood and agreed that 10,000 shares were to go to cash subscribers to Alpha Neon's preferred stock, and 3,750 shares were to be returned to Alpha Neon for use as bonus stock in future sales of preferred or for other corporate purposes.

The petitioner contracted to and did procure subscriptions to 5,000 shares of Alpha Neon's preferred stock at par, with initial payments of 25 percent of the subscription price, the balance to be paid in through installments on call. Except for a few shares on which the final installment was not met, all of the preferred subscriptions were paid up on call. With each share of preferred thus sold, two shares of common were issued as a bonus; this bonus stock came out of the common stock issued to the petitioner.

The Alpha Sign Co. subsequently dissolved.

The stock of Alpha Neon received by petitioner in August 1928 had a fair market value of $196,875 when received.

### OPINION.

Summarizing the facts above set out, at August 30, 1928, Alpha Neon's stock was actually held or contracted for as follows:

|  | Preferred stock | Common stock |
|---|---|---|
|  | *Shares* | *Shares* |
| Alpha Sign preferred shareholders | 2, 472. 8 | 4, 945. 6 |
| Alpha Sign common shareholders | 3, 457 | 6, 914 |
| Cash subscribers | 5, 000 | 10, 000 |
| President of Alpha Sign | | 7, 500 |
| Petitioner | 2, 500 | 10, 000 |
| Donated by Alpha Sign | | 3, 750 |
| Donated by petitioner | | 3, 750 |
| Total | 13, 429. 8 | 46, 859. 6 |

Thus, at August 30, 1928, all of Alpha Neon's stock, except 27.2 shares of preferred and 54.4 shares of common stock, was either issued or contracted for.

Petitioner claims that it and the newly organized Alpha Neon were parties to a reorganization, hence the exchange of patent rights for Alpha Neon stock was a nontaxable exchange under section 112

(b) (4) of the Revenue Act of 1928. This transaction is much like the two last discussed. There is no doubt that there was a "reorganization" as between the Alpha Sign Co. and the new Alpha Neon Co. The Alpha Sign Co. exchanged its assets for stock and then dissolved. The petitioner transferred to the new company patent rights in exchange for stock. The stock so received was substantial in amount—2,500 shares of preferred and, initially, 23,750 shares of common. Part of the common was returned and part went to cash subscribers, but when the transaction was concluded the petitioner had the full 2,500 shares of preferred and 10,000 shares of common. This was a substantial interest. The petitioner was the instigator of the transaction, which had for its purpose the furtherance of the petitioner's business. In our opinion, and we so hold, the petitioner was "a party to a reorganization." The matter was carried out pursuant to "the plan of reorganization" set forth in the contract of June 22, 1928. Petitioner thus meets every test prescribed by section 112 (b) (4), and we hold that no gain is to be recognized on the exchange of patent rights for Alpha Neon stock.

### FINDINGS OF FACT.

6. *Claude Neon Lights of Maryland, Inc.*—This company was incorporated under the laws of Maryland. It is hereinafter called the Maryland Co. It was originally incorporated on February 15, 1928, with 1,000 shares of no par common stock. On June 8, 1928, it entered into a contract with petitioner for the acquisition of patent rights, which was superseded by another contract under date of November 1, 1928. On August 25, 1928, it increased its authorized capital to 9,000 shares of no par common and 2,500 shares of preferred.

Pursuant to the contract of November 1, 1928, the Maryland Co. again in November 1928 increased its authorized capital to 18,000 shares of no par common and 5,000 shares of nonvoting preferred stock of the par value of $100 per share. In December 1928 it acquired from the petitioner the exclusive right to make, use, and vend the devices covered by the Claude Neon patents in eastern Maryland and the District of Columbia, with the exception of a designated small part of the State of Maryland. For these patent rights it issued to the petitioner 1,000 shares of its preferred stock and all (18,000 shares) of its common stock. The petitioner donated back to the Maryland Co. 11,000 shares of the common stock. No other stock was outstanding immediately following the issue of stock to the petitioner. It was provided in the contract that the petitioner was to procure subscriptions in cash at par for 1,700 shares of pre-

ferred stock of the Maryland Co. and that such subscribers were to receive a bonus of two shares of common stock with each share of preferred. Further, the president of the Maryland Co. was to procure subscriptions to 300 shares of preferred, which stock when issued was to carry the same bonus. The subscriptions so contracted for were obtained in the latter part of 1928.

The stock of the Maryland Co. received by petitioner had a fair market value of $107,000 when received.

### OPINION.

The petitioner claims that the Maryland Co. transaction was a nontaxable exchange under either subsection (4) or (5) of section 112 (b) of the Revenue Act of 1928. We will consider first the claim under subsection (5). The requirements of this subsection are the same as those of section 203 (b) (4) of the Revenue Act of 1926 quoted above under the Bellows transaction.

The Maryland Co. was originally organized with 1,000 shares of stock, which in August 1928 were increased, and again, in November, pursuant to the contract with petitioner of November 1, 1928, its capitalization was increased to 5,000 shares of preferred and 18,000 shares of common stock. Following the change of its capitalization, its initial issue of stock was 1,000 shares of preferred and all of its common stock, issued to the petitioner in exchange for patent rights. Apparently no stock had been issued prior to that issued to the petitioner, as the evidence is that upon completion of the transaction with the petitioner no other stock was outstanding. Some preferred stock was later sold.

The granting of the patent rights was a transfer of property by the petitioner, and immediately after the transfer the petitioner was in control of the outstanding stock of the Maryland Co. These facts bring the transaction within section 112 (b) (5), and no gain is to be recognized on the exchange. In view of this conclusion, it is not necessary to consider whether subsection (4) is applicable.

---

### FINDINGS OF FACT.

7. *New Jersey Claude Neon Corporation.*—This corporation was organized under the laws of New Jersey on December 27, 1928, with an authorized capital stock of 15,000 nonvoting preferred shares, par value $100 per share, and 36,000 no par common shares. It was organized pursuant to a contract between the petitioner and the Neonlite Corporation of America, a New Jersey corporation, hereinafter called Neonlite.

Neonlite was engaged in the sign business and was a competitor of the petitioner. Under the contract Neonlite, on or about February 1,

1929, transferred to the new corporation its going business and good will, and all its assets except cash and receivables, and received therefor 750 shares of preferred stock and 6,500 shares of common stock of the new corporation. The contract provided that 5,000 shares of the common stock were to be issued to Neonlite for its going business and good will, and the preferred and the balance of the common stock for all other assets. Neonlite's total assets amounted to $459,924.73, of which $54,924.73 represented cash and receivables. The cash and receivables, amounting to only about 11 percent of the total assets, were retained for the purpose of liquidating Neonlite's liabilities. At the same time the petitioner granted to the new corporation exclusive rights under its Claude Neon patents in the State of New Jersey (excepting Camden, Gloucester, and Salem counties) and received therefor 2,250 shares of the new corporation's preferred stock and 7,000 shares of common stock. The contract required the petitioner and Neonlite together to procure subscriptions to 3,750 shares of preferred stock of the new corporation at par for cash to provide working capital for the corporation. Each share of preferred was to carry a bonus of two shares of common. By February 1, 1929, the required subscriptions had been obtained. By that time cash had been paid in on 250 of the preferred shares and at that time certificates for that number of preferred shares and 500 shares of common were issued. The balance of the cash subscriptions were subsequently paid on call.

The stock of the New Jersey Claude Neon Corporation received by petitioner had a fair market value of $232,000 when received.

### OPINION.

The transaction between petitioner, Neonlite, and the New Jersey Claude Neon Corporation is claimed by petitioner to come within both subsections (4) and (5) of section 112 (b) of the Revenue Act of 1928.

In our opinion it falls within subsection (4) as a transaction whereby "a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization." There was a reorganization as between Neonlite and the New Jersey Claude Neon Corporation within the parenthetical clause of paragraph (A) of section 112 (i) (1). That is, New Jersey Claude Neon acquired for stock substantially all the properties of Neonlite, only cash and receivables being retained by Neonlite for the purpose of liquidating liabilities. Cf. *Western Industries Co.* v. *Helvering*, 82 Fed. (2d) 461; *Milton Smith*, 34 B. T. A. 702. The petitioner, by reason of its interest in the transaction and its exchange of patent

rights for stock, was a party to the reorganization. It received only stock which represented a definite and substantial interest in the transferee. Cf. *Fifth Avenue Bank of New York, Executor, supra.* The exchange was made pursuant to the contract which set out the plan of reorganization, and was therefore an exchange in pursuance of the plan of reorganization and no gain is to be recognized.

We are further of the opinion that the transaction here was a nontaxable exchange under the case of *Halliburton* v. *Commissioner, supra.* Two parties, Neonlite and the petitioner, paid in property for stock, while a third group paid in cash for stock, which cash under the *Halliburton* decision is to be considered as property.

### FINDINGS OF FACT.

8. *Claude Neon of Connecticut, Inc.*—This corporation, hereinafter called the Connecticut Co., was organized pursuant to an agreement between petitioner and James T. Kane, who owned all the 650 outstanding shares of stock of the Kane Sign Service, Inc. The first meeting of the incorporators of the Connecticut Co. was held on May 18, 1929. In accordance with formal resolutions adopted at that meeting Kane transferred his 650 shares of Kane Sign stock to the Connecticut Co. for 250 shares of its preferred stock, par $100, and 1,500 shares of its common stock, par $5, plus $34,100 in cash. At the same time the petitioner granted to the Connecticut Co. the exclusive right to make, use, and sell under the Claude Neon patents in the whole of the State of Connecticut and one township in the State of New York. In exchange for the patent rights the petitioner received 2,000 shares of the Connecticut Co.'s preferred stock and 9,498 shares of its common stock. Two shares of common were issued to individuals who had subscribed therefor in behalf of the petitioner. Subsequently, preferred stock was issued for cash in accordance with the original understanding of the parties to the transaction.

The stock of the Connecticut Co. received by the petitioner had a fair market value of $204,000 when received.

### OPINION.

It is claimed that the Connecticut Co. exchange is not taxable on the ground that it comes under both subsections (4) and (5) of section 112 (b) of the Revenue Act of 1928. We need not pass on whether or not it comes under subsection (5) as in our opinion it does come within subsection (4).

Kane transferred all the outstanding stock of the Kane Sign Service, Inc., to the new corporation for 250 shares of preferred and 1,500

shares of common stock of the latter, and cash. This was a reorganization under section 112 (i) (1) (A). While Kane's receipt of cash might render him taxable, it does not change the fact that the new corporation acquired all the stock of the old and that Kane's stock interest in the new corporation was definite and material and represented a substantial part of the value of the property that he transferred. *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378. In resolutions of directors of the new corporation the stock acquired from Kane was declared to be worth at least $66,600. There is no evidence of any lower value, and on the basis of that figure the stock of the new corporation of the par value of $32,500 must be said to represent a "material part of the value of the transferred assets." *Helvering* v. *Minnesota Tea Co., supra.*

There are in evidence resolutions of the incorporators of the new corporation which, with the deposition of one of its incorporators and directors, who was also a director of the petitioner, establish the existence of the plan of reorganization and also that the exchange of patent rights for stock was in accordance with the plan. The petitioner's participation in the plan made it, in our opinion, "a party to the reorganization" within the meaning of section 112 (b) (4). See discussion and cases cited under the Claude Neon Displays, Inc., transaction above. We accordingly hold that the present transaction is nontaxable.

MISCELLANEOUS FINDINGS OF FACT.

*Income from manufacturer and sale of signs.*—The petitioner during the fiscal years 1925 to 1930, inclusive, carried on the manufacture, sale, and maintenance of neon signs in New York City and other territory not covered by exclusive licenses to other corporations. Gross receipts from this source were as follows for the following fiscal years ended June 30:

| | | | |
|---|---|---|---|
| 1925 | $103,263.00 | 1928 | $723,437.57 |
| 1926 | 224,588.00 | 1929 | 975,803.29 |
| 1927 | 392,358.08 | 1930 | 951,168.20 |

Gross income was reported as follows:

| | Fiscal years ended June 30 | | | | | |
|---|---|---|---|---|---|---|
| | 1925 | 1926 | 1927 | 1928 | 1929 | 1930 |
| Sales, signs, and service | $73,170.86 | $166,032.36 | $423,802.40 | $425,033.72 | $660,180.85 | $890,491.87 |
| Cost | 72,779.03 | 187,805.22 | 363,502.03 | 315,797.85 | 470,146.51 | 596,145.03 |
| Gross profit on sales | 391.83 | [1] 21,772.86 | 60,300.37 | 109,235.87 | 190,034.34 | 294,346.84 |
| Receipts from licenses, royalties | | | 7,214.54 | 17,825.69 | 34,563.18 | 34,933.01 |
| Interest and discounts | 1,258.85 | 1,826.76 | 2,999.33 | 5,351.57 | 11,967.50 | 10,419.18 |
| Patent rights | | 50,266.71 | 409,500.00 | | 983,481.50 | |
| Dividends | | 6,457.50 | 8,750.00 | 14,214.08 | 82,912.10 | 163,288.24 |

[1] Loss.

*Experimental expenses.*—Petitioner maintained a laboratory in Long Island City where it employed 20 or 22 engineers in research in electricity, rare gases and tubular lighting. Its purpose was two-fold; to improve petitioner's existing product, and to develop new ideas on tubular lighting for petitioner and its licensees. In 1927 the laboratory work was done in a space partitioned off from the general shop but in later years it was done in a separate building. The laboratory expense in petitioner's fiscal year 1927 was $11,358.66; in 1928, $7,699.37; and in 1929, $46,472.76; of which about 50 percent in 1927 and 1928, and 60 percent in 1929 represented salaries of engineers, the remainder being for rent, traveling expenses, electricity, and laboratory materials. Beginning with January 1, 1929, the experimental laboratory was carried on under the "Associated Claude Neon Plan", by which the subsidiaries contributed pro rata for its upkeep, but only so much is here claimed as was paid by petitioner in the first half of its fiscal year 1929. The engineers whose salaries are included above were engaged also in perfecting new patents, for which application was made in 1928 or 1929, and patents issued in 1929, 1930, 1931, and 1932.

The evidence is clear that petitioner filed in 1928 and 1929 patent applications as a result of this experimental research, and that patents were issued thereon in 1929, 1930, 1931, and 1932.

We think in these circumstances that the laboratory expenditures were not in the nature of ordinary and necessary expenses, but were capital expenditures, and should therefore not be deducted in computing net income, but exhausted over the life of the new patents. *John F. Canning*, 29 B. T. A. 99; *Forest Products Chemical Co.*, 27 B. T. A. 638; affd., C. C. A., 6th Cir. (unreported) ; certiorari denied, 294 U. S. 726. If any part of them was not a capital expenditure, the petitioner has failed to show how much, and must accordingly fail on this claim.

The petitioner's claim of the deduction of amounts spent in patent litigation having been abandoned, it is not considered.

---

OPINION.

*Basis for gain or loss.*—We have held above in our consideration of the eight corporations organized to operate under petitioner's patents that the receipt of stock for patent rights did not give rise to taxable gain. In view of this conclusion it is perhaps unnecessary to decide the basis for gain or loss, but, as both parties have gone into the matter in their presentation of the case and in their briefs, we think it not improper to state our opinion of the question.

The respondent in computing gain on all eight transactions determined the value of the stock received by the petitioner in each case, against which he allowed certain deductions for expenses. There is no

evidence of error in these figures and in each case we have accepted and found as a fact the value determined by the respondent.

The petitioner's view is that in any transaction held to result in gain the basis is that part of the cost of the patents represented by the ratio that the value of the stock received for the particular territory bears to the value of all the territory throughout the United States. That formula appears to us to be a proper one to be applied under the facts in this case. Manifestly the cost of the grant for a particular territory can not be exactly determined. As far as the record shows all the transactions here involved were consummated at arm's length and presumably each one represents to a fair degree the value of the particular territory. In reaching the total value which the petitioner says represents the assignment value of each of the several territories in the United States, the petitioner starts with the values ascribed by the respondent to the territories assigned in and prior to the taxable years, aggregating $1,353,545.04. To this it adds the value of stock received in subsequent years for one other territory and the estimated value of the remaining territories, less in each case commissions and territorial development costs. The total figure thus reached is $1,818,545.04. The figures given are supported by credible evidence and the result reached represents a reasonable estimate of value. We find as a fact that $1,818,545.04 represents the value of all territories in the United States assigned and/or susceptible of assignment under exclusive grants. So much for the formula.

The stipulation filed shows that the petitioner issued to Georges Claude its common stock of the value, when issued, of $494,375, preferred stock of the value of $50,000, and paid him cash in the amount of $44,509.17, making a total of $588,884.17. There is in one tabulation contained in the stipulation an amount of $80,000 purporting to represent stock issued to Claude, without any date or explanation, which does not appear in another tabulation which shows all the stock issued by petitioner. This amount is claimed by petitioner as being part of the cost of the patents. It appears that this amount may have been inserted in the one tabulation in error. At any rate, standing as it does, we do not feel justified in finding that it should go into cost. If it is a proper item, it may be explained in the settlement under Rule 50. As the record now stands, we find the cost of the patents to petitioner to be $588,884.17. Taking a specific case, the Bellows transaction, if taxable, would have as a basis for gain or loss a figure found by multiplying total cost ($588,884.17) by the fraction 146,475.45/1,818,545.04.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MURDOCK, MELLOTT, and DISNEY dissent.