Viber Company v. Commissioner.
Viber Co. v. Commissioner
Docket No. 749.
United States Tax Court
1944 Tax Ct. Memo LEXIS 84; 3 T.C.M. (CCH) 1066; October 11, 1944
*84 Louis Lombardi, Esq., 510 W. Sixth St., Los Angeles, Calif., for the petitioner. Byron M. Coon, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This proceeding involves a determination of income tax deficiencies for the years 1938, 1939 and 1940 in the amounts of $245.02, $92.57 and $325.55, respectively. The issue is whether the Commissioner erred in disallowing parts of the amounts deducted by the petitioner for those calendar years for amortization of patents. This turns on the question of what is the proper basis for those patents. Petitioner filed its income tax returns for the years 1938, 1939 and 1940 with the collector of internal revenue for the 6th district of California. Findings of Fact Petitioner, engaged in the manufacturing of cement compacting machines, was incorporated under the laws of the State of California on January 12, 1938, for the purpose of acquiring the property and assets of Viber Company, Ltd., a Nevada corporation, hereinafter called the Nevada Company. The Nevada Company had functioned unsuccessfully. It had been formed on June 17, 1932, for the purpose of acquiring certain patents and patent rights owned by Graham *85 M. Gordon and associates. The patent rights transferred to petitioner by the Nevada Company were set up on the books of petitioner at $37,500. This figure was derived from the fact that the contract by which the assets and liabilities of the Nevada Company were taken over by petitioner provided for the issuance by petitioner to the Nevada Company of no more than 375 shares of petitioner's capital stock, $100 par value. One of such shares was to be issued to Nevada Company for each share sold for cash until the 375 shares had been so issued. At the first meeting of the petitioner's board of directors on February 18, 1938, the secretary presented to the meeting a letter from the Nevadacompany as follows: "Gentlemen: "Viber Company, Ltd., pursuant to a resolution of its board of directors adopted February 18, 1938, hereby offers to sell and transfer to you certain property and assets belonging to it, as follows. "Patents, inventions, trademarks and good will. Equity in accounts receivable. Inventory, consisting of: Finished units. Parts and materials. Equipment, consisting of: Shop machinery, tools, jigs, and equipment. Office furniture and equipment. Demonstration and testing *86 equipment. Two automobiles and a truck. Supplies and prepaid expense, consisting of: Prepaid rent. Unexpired insurance. Shop supplies. Shipping supplies. Stationery and sales literature. "The consideration for the transfer of the patents, inventions, trademarks and good will shall be that you shall issue to Viber Company, Ltd. not to exceed 375 shares of your capital stock of the par value of $100.00 per share, said shares to be issued pari passu with shares sold for cash. The consideration for the transfer of the assets other than patents, inventions, trademarks and good will shall be that you shall assume payment of $23,707.81 of the liabilities of Viber Company, Ltd. together with liabilities incurred in the regular course of business subsequent to December 31, 1937. "Very truly yours, VIBER COMPANY, LTD. By E. B. Jorgensen, Vice-President By W. R. Stott, Secretary." Thereupon a resolution was unanimously adopted accepting the offer of Nevada Company and declaring "* * * That the fair value of this corporation of the patents, inventions, trademarks and good will, for which not to exceed three hundred seventy-five (375) shares of this corporation are to be issued *87 pari passu with shares sold for cash; is and the same is hereby determined to be thirty-seven thousand five hundred dollars ($37,500.00)." During the time involved in this case only 175 shares had been so issued since only that number had been sold for cash, that is, $17,500 par value. On April 6, 1938, $15,000 worth of stock was sold for cash and an equivalent amount of stock was issued to the Nevada Company. Later in 1938 petitioner sold an additional $2,500 par value of its capital stock and concurrently issued $2,500 par value of its stock to the Nevada Company. No additional sales of stock were made during the years here involved. The Nevada Company had acquired its assets in the following manner. At the first meeting of the board of directors on June 17, 1932, the secretary read to the meeting the following letter from Graham M. Gordon and his associates: "Viber Company, Ltd., Reno, Nevada. "Gentlemen: "We, the undersigned, hereby offer to transfer, assign and set over to your company, a Nevada corporation, all our right, title and interest in and to the following described property: 1. U.S. Patent No. 1,747,555, Feb. 18, 1930, John C. Pelton, "Apparatus for Compacting *88 Plastic Materials," title transfer recorded in the United States Patent Office Transfers of Patents Liber U151 Page 507, Feb. 19, 1932. U.S. Patent No. 1,784,385, Dec. 9, 1930, John C. Pelton, "Compacting Machanism"; title transfer recorded in the United States Patent Office, Transfers of Patents Liber II52 page 435, April 5, 1932. U.S. Patent No. 1,800,401, April 14, 1931, John C. Pelton, "Means for Producing Dense Concrete Articles"; title transfer recorded in the United States Patent Office Transfers of Patents Liber I 152 page 437, April 5, 1932. 2. An invention constituting an improvement in method and apparatus for compacting materials by vibration and the application thereon for letters patent of the United States. 3. A Trademark for which there has been filed application for registration, serial No. 321,853, dated May 7, 1932, in the United States Patent Office. 4. An invention constituting an improvement in method and apparatus for compacting and dewatering cementitions mixtures and the application thereon for letters patent of the United States (Serial number 60315). 5. An invention on method and apparatus for coating pipe with plastic composition, and the application *89 for letters patent of the United States (Serial number 568,780) made by the Inventor Thomas H. Wilson. 6. An invention on method and apparatus for making articles of plastic composition, and the application thereon made by the Inventor Thomas H. Wilson for letter patent of the United States (Serial number 484,372). 7. An invention constituting an improvement in method and apparatus for compacting and dewatering cementitions materials and the application thereon for letters patent of the United States. Said property stands in the name of Graham M. Gordon but the beneficial interest thereon is divided as follows: Graham M. Gordon
45%
Colin L. Campbell
10%
W. Stott
20%
Charles E. Little
20%
Miner L. Hartmann
5%
"For and in consideration of our conveying said above described property to your company, there shall be conveyed to us by your said company One Hundred Thousand ($100,000.00) Dollars, par value of the common stock and One Hundred Thousand ($100,000.00) Dollars, par value of the Preferred stock of your said company in the following proportions: To Graham M. Gordon: 450 shares of common stock of the par value of $100.00 each, and 450 shares of preferred stock *90 of the par value of $100.00 each. To Colin L. Campbell: 100 shares of common stock of the par value of $100.00 each, and 100 shares of preferred stock of the par value of $100.00 each. To W. Stott: 200 shares of common stock of the par value of $100.00 each, and 200 shares of preferred stock of the par value of $100.00 each. To Charles E. Little: 200 shares of common stock of the par value of $100.00 each, and 200 shares of preferred stock of the par value of $100.00 each. To Miner L. Hartmann: 50 shares of common stock of the par value of $100.00 each, and 50 shares of preferred stock of the par value of $100.00 each. "Appropriate assignment of the above described property will be handed you immediately upon the acceptance of this offer. "Respectfully yours, Graham M. Gordon Colin L. Campbell W. Stott Charles E. Little Miner L. Hartmann" The board of directors accepted the offer contained in the letter and the stock was issued accordingly. The opening entry on the corporation's books list patent rights and patents at $243,025, that is, an item "Patent Rights" was set up at $200,000 and "Cost of Patents" at $43,025. Thereafter, the item of $43,025 for "Cost of Patents" *91 was removed from the books with a debit to paid-in surplus for $43,025, with the explanation shown on the journal sheet, "To eliminate cost of patents set up out of paid-in surplus. Original agreement calls for $200,000 stock in full payment for patents." In November 1935 the 1,000 shares of preferred stock which the Nevada Company had issued as above were returned by the holders thereof to the treasury for cancellation and were duly cancelled, leaving only the shares of common stock issued and outstanding. This reduced the patent rights to $100,000. At the meeting of the board of directors on January 13, 1936, the treasurer was authorized to adjust the books of the corporation so that the distribution of the charge of $100,000 par value of the common stock be as follows: Patent rights
$ 41,600.00
Miscellaneous assets
5,811.21
Good will, trade name and
development
52,588.79
$100,000.00
There is no dispute between the parties as to the expenditures made by the two corporations for development of patents the total of such amounts being $13,696.21. Prior to the formation of the Nevada Company, Graham M. Gordon had been conducting experiments and building vibrating *92 machines for the compacting of cement. It was the patents which he had acquired prior to June 30, 1932, that were turned over by him and his associates to Nevada Company upon its formation. He acquired the basic Pelton patents from Perez Babcock and experimented to improve and perfect them. Petitioner's equipment was exclusively used on the Hoover Dam. It was used in construction work by the Tennessee Valley Authority; on the Metropolitan Aqueduct that was built from the Colorado River, and for the Grand Coulee and Bonneville Dams, as well as in many foreign countries. Prior to petitioner's inventions concrete had been compacted by applying vibration to it externally. Mechanical appliances had been bolted to forms externally and the motion would be applied through the forms into the concrete. The engineering objection to that was that the concrete lacked uniform strength. The forms would act as a bellows, drawing the mortar from the center of the concrete section to the surface and thereby decreasing the strength at the center. Petitioner's invention overcame this objection and secured the needed uniformity. By dropping a vibrator into the concrete it applies the vibration from the *93 center out and this produces uniform and stronger concrete. Gordon developed four small machines capable of vibrating thin slabs of concrete. Machines which Gordon had made, both rigid type and flexible shaft machines, were used on construction jobs. Their action was studied and changes were made. It was not until after the first corporation was formed that the machines could be called commercially successful in that they would continue to run under actual working conditions. On February 1, 1932, William R. Stott became associated with Gordon as a partner in order to develop the vibrating machine patents which Gordon then owned. Stott paid Gordon $5,000 in cash for a 20 percent interest in Gordon's patent interests with the understanding that Stott's interest would not be recorded in the patent office but that Stott would receive 20 percent of the capital stock of a corporation which would be organized and to which the patents and patent rights and incidental property would be transferred. Stott worked in the office and kept the records. Also associated with Gordon at the same time were C. E. Little and a patent attorney Miner L. Hartmann, who furnished his services and procured *94 2 patents in return for a 5 percent interest in the corporation to be formed. In May 1932 Colin Campbell invested $10,000 in the organization in return for 10 percent interest in the corporation to be formed. The acquisition of stock in petitioner corporation by the Nevada Company and others in exchange for their property constituted a single transaction. The acquisition of stock in the Nevada Company by Gordon and his associates in exchange for their property was as to each substantially in proportion to the interest of each in the property held by them prior to the exchange, and the acquisition constituted a single transaction. Expenditures by Gordon and his associates in experimentation led to the issue of patents which were improvements on the basic Pelton patents. The cost basis of its patents to petitioner is $28,969.21. Of this amount respondent has conceded $13,696.21 which was expended after incorporation. Opinion The respondent has disallowed parts of the amounts deducted by petitioner for amortization of patents under section 23(1) of the Revenue Act of 1938 and the Internal Revenue Code. The respondent's theory in determining the deficiencies is that the transfer *95 of assets both from the Nevada Company to the petitioner and from Gordon and associates to the Nevada Company were tax-free transactions within the meaning of section 112(b)(5) so that the basis of the patents for amortization was their original cost to Gordon and associates, Art. 23(1)-7, Regulations 101 and Sec. 29.23 (1)-7, Regulations 111 [1]; and that such original cost to Gordon has not been proven satisfactorily so that the petitioner is without a basis for amortization of cost of the patents incurred prior to incorporation. Petitioner contends that he has introduced adequate though admittedly meager evidence of the original cost of the patents to Gordon. He makes no argument as to whether or not the transfers were tax-free transactions, but urges that his evidence is sufficient and sets up computations as to the basis for the patents in either event. Although petitioner's counsel, in his opening statement to the court said, "I am willing *96 to accept the law of those two cases so far as it goes back to July 1, 1932, but not farther, because I think that I can put on evidence to show that the transferors in fact did not get out the proportion of stock to the property they actually put in", he made no attempt to introduce such evidence. (The cases referred to held transfers to be tax free transactions. He further said: It is my personal opinion that that transaction, in view of the fact that some of the stockholders of the Nevada company also purchased stock for cash, was probably a nontaxable transfer. * * * * *
There was no acquisition cost allowed at all and no value allowed for the patents when they first appeared upon the books of the corporation. Frankly, I am not interested whether the Court takes the theory that the transfer of the patents in June, 1932, was a taxable transaction or whether it wasn't a taxable transaction. My contention is that sound judicial reasoning will allow some value. We consider first the nature of the transfer from the Nevada Company to petitioner. The Nevada Company had functioned unsuccessfully and the petitioner was formed pursuant to a plan by which the Nevada Company would contribute *97 its assets, including the patents in question, in return for stock in petitioner while certain individuals would contribute cash for stock. The petitioner was also to assume payment of the liabilities of the Nevada Company. The plan provided that not more than 375 shares of $100 par value were to be issued to the Nevada Company; such shares to be issued at the rate of one share for each share sold for cash. Actually $17,500 worth of stock was sold for cash and an equivalent amount of stock was issued to the Nevada Company. Section 112 (b) (5), Revenue Act of 1938, provides: SEC. 112. RECOGNITION OF GAIN OR LOSS. * * * * *
(b) Exchanges Solely in Kind. - * * * * *
(5) Transfer to Corporation Controlled by Transferor. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property *98 prior to the exchange. We think respondent's contention is correct that the transfer comes within that section. "Property", in section 112(b)(5), includes money. Halliburton v. Commissioner, 78 Fed. (2d) 265; Portland Oil Co. v. Commissioner, 109 Fed. (2d) 479, certiorari denied 310 U.S. 650; Claude Neon Lights, Inc., 35 B.T.A. 424. As was pointed out in those cases, where it is necessary to differentiate between money and other property the statute does so. See section 112 (c), (d) and (e). Section 111 (b) uses the expression "property (other than money)" and similar language is used in section 113 (a)(6). Those cases further point out that there appears to be no reason why money paid for stock should not be considered property within the meaning of the section. We likewise agree with respondent that the exchanges carried out in consummation of a prearranged plan are to be considered as a single transaction not unlike those in Halliburton v. Commissioner, supra, and Portland Oil Co. v. Commissioner, supra. *99 Petitioner, in fact, says that it does not quarrel with the application of those cases. Petitioner did not prove or make any attempt to prove that the stock which it issued was not in proportion to the value of assets contributed or paid in to it. Since no gain or loss is to be recognized to the transferor Nevada Company, the basis of the patents in the hands of petitioner is the same as the basis to the Nevada Company increased by the additional patent costs incurred by petitioner after the transfer. Sections 113 (a)(8) and 114 (a), Revenue Act of 1938. [2]
*100 In order to ascertain the basis of the patents to the Nevada Company we must examine the nature of the transaction by which it acquired them. In their offer to turn over their patents and inventions to the newly formed corporation, Gordon and his associates set forth their respective fractional interests in the patents and stock was issued to them in the same proportions by Nevada Company. Thus, the 1932 transactions came under section 112 (b) (5) of the Revenue Act of 1932. No gain or loss was recognized to the transferor at that time, and the basis of the patents is the cost to Gordon and his associates. Sections 113 (a)(8) and 114 (a), Revenue Act of 1932. Gordon acquired the basic Pelton patents from Perez Babcock and experimented to improve and perfect them. Although the machines for compacting concrete by vibration had not reached the commercial stage prior to the formation of the corporation, they were built and put out on construction jobs so that their reaction under actual working conditions could be studied. Gordon did not appear as a witness; counsel for petitioner stated that he believed Gordon was in the British Army. No records of the costs, development costs, *101 acquisition costs and patent application costs prior to incorporation were put in evidence. Counsel for petitioner declared them to be lost or destroyed. One of Gordon's associates, C. E. Little, who would have had personal knowledge of the costs, was declared by petitioner's counsel to be in the American Army in Panama. He (C. E. Little, a mechanical engineer) worked in developing the mechanical side, that is, the vibrator itself as well as developing its application in the field. Stott, the only available associate who had knowledge of the expenditures made in developing the patents, in testifying to such expenditures, said that Gordon paid C. E. Little "on the order of $200 or $225 a month" for about 10 months. His testimony went on: My memory is that Little went with Mr. Gordon in the summer of 1931 and he continued with us after my association with Mr. Gordon on February 1, 1932, on through the incorporation. * * * * *
To the best of my recollection, I would say that we probably spent on the order of $750 to $1,000 a month with Fernholtz. [Fernholtz Machinery Company, for mechanical work on the vibrators.] * * * * *
We spent money with Kaelin Electric Company. It was on *102 the order of - I would say it would average $100.00 to $150.00 a month for that same period, depending on how many motors we had to repair. * * * * *
I recall that we built about ten flexible shaft machines in that period. We undoubtedly purchased twenty-five flexible shafts from Thackaberry, plus a lot of miscellaneous items. Those flexible shafts ran $50.00 to $60.00 each. Q. That would come to $500.00 or $600.00? A. Yes, that is right. * * * * *
I think we bought ten to fifteen of those motors, [from General Electric] and I recall those motors cost approximately $35.00 to $40.00 apiece. * * * * *
We were also developing a vibrator to be driven by motors, and I think we bought two or three air motors from Chicago Pneumatic. Those cost something on the order of $30.00 apiece. * * * * *
When I went with Mr. Gordon I think he owed Professor Davis [Dean of School of Engineering and professor in Civil Engineering, University of California] on the order of about $4,000.00. * * * * *
That was for testing work at Professor's Davis' laboratory at the University of California. * * * * *
Testing vibrators against, in test cylinders, compact in concrete. As for the period *103 when Stott was associated with Gordon prior to incorporation he testified: We continued as a group to employ Davis and his laboratory to carry on this testing work. What we spent with them is just a matter of memory - what we spent with him. It was on the order of a couple of thousand dollars in that four months' period. With regard to the money paid to Osborn Laboratories for various tests, Stott testified: We carried on a large number of them. I would say, to the best of my memory it was on the order of $400.00 to $500.00 a month. * * * * *
The only period I know definitely about is from February 1, 1932 until June 30, 1932. There is no evidence as to what Gordon actually paid Babcock for the Pelton patents nor as to the value of Hartmann's services in procuring two patents for the group in return for which he was given a 5 percent interest in the corporation. The record does not contain the facts or figures from which the costs incurred by Gordon and his associates for the development of patents may be computed with any exactness. However, having concluded that they did make expenditures which culminated in the issue of patents, it is incumbent upon us to determine the *104 extent thereof as best we may on such facts as we do have. Cohan v. Commissioner, 39 Fed. (2d) 540; Isbell-Porter Co. v. Commissioner, 40 Fed. (2d) 432; Max German, 2 T.C. 474. Bearing in mind that petitioner's inexactitude is of its own making, it is our conclusion that patent costs to Gordon and his associates were $15,000. The experimental expenditures resulting in patents were capital expenditures to be exhausted over the life of the patents. Claude Neon Lights, Inc., supra, p. 442. We accordingly hold that respondent erred in not allowing $15,000 in addition to the $13,969.21 conceded as the cost basis of its patents to petitioner for the purpose of computing its depreciation amortization. Decision will be entered under Rule 50. Footnotes
1. SEC. 29.23 (1)-7. Depreciation of Patent or Copyright. - In computing a depreciation allowance in the case of a patent or copyright, the capital sum to be replaced is the cost or other basis of the patent or copyright. * * *↩
2. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * * * *
(8) Property Acquired by Issuance of Stock or as Paid-In Surplus. - If the property was acquired after December 31, 1920, by a corporation - (A) by the issuance of its stock or securities in connection with a transaction described in section 112(b)(5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or (B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. (a) Basis for Depreciation. - The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property.↩