**E. I. Du PONT de NEMOURS AND COMPANY**

**v.**

**The UNITED STATES.**

**Nos. 256–66 and 371–66.**

United States Court of Claims.

Jan. 18, 1973.

Karl R. Price, Washington, D. C., atty. of record, for plaintiff. Roy A. Wentz, Jr., Wilmington, Del., John R. Malloy, Cleveland, Ohio, and Ivins, Phillips & Barker, Washington, D. C., of counsel.

Michael Abrutyn, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Philip R. Miller and Gilbert W. Rubloff, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

DAVIS, Judge.

We are narrowly concerned with only one issue on these limited cross-motions for partial summary judgment in plaintiff E. I. Du Pont de Nemours and Company's (Du Pont) complex tax refund suits for 1959 and 1960. That question involves only one of the firm's inter-corporate transactions, presented by a set-off defense raised by the Government against the refund claims.[1] There is agreement upon the facts of this transaction, and only a legal problem—the application of section 351 of the Internal Revenue Code, 26 U.S.C. § 351 (1970)—remains to be decided.

In 1959, Du Pont was engaged in the domestic sale and exportation (to France, among other places) of urea herbicides. Although doing the manufacturing in this country, the company owned French patents for the product. French law provided that French-patented items must be manufactured in France within three years of the issuance of the patent. If this were not done, the owner had to grant, upon request, a license to a French producer. In order to forestall that result, with its potential loss of income, Du Pont organized (in October 1959) a wholly-owned French subsidiary, Du Pont de Nemours (France) S.A., to manufacture the herbicide in France.[2] By agreement in December 1959 plaintiff granted to the subsidiary a royalty-free, non-exclusive license to make, use and sell urea herbicides under the French patents. Du Pont thereby gave up its right to assert patent infringement against the subsidiary's products for the duration of the license, which was for the remaining life of the patents. The subsidiary had the right to sublicense manufacturing for its own needs, but any other sublicensing could only be done with the parent's consent. In exchange for this grant, and in lieu of royalties, Du Pont received stock in the subsidiary valued at $411,500. After the award of the license, the subsidiary proceeded to arrange for manufacture of the herbicides for its own account by an unrelated French firm.

Before undertaking this arrangement, taxpayer requested rulings from the Commissioner of Internal Revenue as to whether the proposed transaction would comply with the requirements of sections 351 and 367 of the Code. Section 351(a), as enacted in the 1954 Code and in effect in 1959, provided that:

(a) General rule.—No gain or loss shall be . . . recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such

---

1. The parties have agreed to settle most of the claims in the two refund actions; a single large issue (aside from that now before us, and related questions) is still to be litigated.

2. If forced to grant a license to a French manufacturer, Du Pont feared that the French market would be cut off for all non-French producers of the herbicide. In that situation, the license royalties Du Pont would receive would approximate, it thought, only one-third of the income it could expect through its own French manufacturer.

corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

Section 367 declared that, if the transaction involved transfer of property to a foreign corporation in exchange for its stock, nonrecognition would only be granted if it were established to the Commissioner's satisfaction that the exchange were not part of a plan for the avoidance of federal income tax. The Internal Revenue Service ruled in November 1959 that the demands of section 367 were met, but not those of section 351. It was said that "[s]ince all substantial rights of the patents will not be transferred * * * to the new French company, such patents will not be considered property within the meaning of section 351 * * *." Despite this holding, Du Pont proceeded with the incorporation of the subsidiary, and the grant of the non-exclusive license, but the worth of the affiliate's stock was not included as income in taxpayer's 1959 return. Since the shares received by Du Pont were valued at $411,500, and it claimed no basis in the patents, the size of the present claim by defendant for setoff is $411,500.[3]

There is no question, of course, that plaintiff meets the condition of section 351 that it must be in control of the subsidiary after the transaction. The controversy implicates the other prime elements of the provision: "property", "transfer", "exchange." The Government has vacillated somewhat in tying the articulation of its position to one or another of those statutory terms. The 1959 ruling given to taxpayer deemed the patent rights transferred to the subsidiary not to be "property". Conceding that this "did not adequately express the basis for the Government's action," the defendant now stresses the reasoning of Rev.Rul. 69–156, 1969–1 Cum.Bull. 101:

 The grant of patent rights to a corporation will constitute a transfer of property within the meaning of section 351 of the Code only if the grant of these rights in a transaction which would ordinarily be taxable, would constitute a sale or exchange of property rather than a license for purposes of determining gain or loss. In order for such a grant of patent rights to * * * constitute a sale or exchange, the grant must consist of all substantial rights to the patent.

The present emphasis is thus on the "exchange" requirement, with that factor being equated with the concept of "sale or exchange" under the capital gains provisions of the Code. If a transaction does not qualify as a "sale or exchange" for those purposes, it cannot (according to the defendant) be a "transfer" of "property" "in exchange" under section 351. On that view, the Government would be entitled to its offset since it is settled that the proceeds of a grant of a simple nonexclusive patent license are not eligible for capital gains treatment. To attain that status there must normally be a transfer of an interest in all substantial rights to the patent, or of exclusive rights in a defined area. *See, e. g.,* E. I. Du Pont de Nemours & Co. v. United States, 288 F.2d 904, 911–912, 153 Ct.Cl. 274, 287–288 (1961).

I.

The first and principal problem, then, is whether section 351 embodies the same notions as the capital gains provisions (26 U.S.C. § 1201 et seq. (1970)). In searching out the answer, we look to the language of the sections being compared, their individual purposes, their history and context, as well as their treatment by the courts.

---

3. The Service did not, in reviewing taxpayer's return for 1959, take the position that the $411,500 should have been returned as income, but defendant has now raised that issue as a set-off defense to the refund claims.

Congress, it is plain, did not use identical wording. First, section 351 speaks of "property", not of "capital assets", and the Government concedes that section 351 can apply to property which is not a capital asset. Nonrecognition under the provision has been granted, for instance, to transfers of physical inventory (see Connolly Tool & Eng'r Co., 23 CCH Tax Ct.Mem. 1222, 1224 (1964)), of accounts receivable (see P. A. Birren & Son, Inc. v. Commissioner, 116 F.2d 718 (C.A. 7, 1940)), and of money (Halliburton v. Commissioner, 78 F.2d 265 (C.A. 9, 1935), accepted in G.C.M. 24415, 1944 Cum.Bull. 219).[4] Second, the capital gains part of the Code uses "sale or exchange" of an asset (see 26 U.S.C. § 1222 (1970)), while section 351 is phrased in terms of property "transferred * * * in exchange." This latter difference is obviously not controlling, but the fact that the drafters made the distinction in language cautions against a wholesale and automatic adoption for section 351 of the concepts of the capital gains provisions. The bare words of the statutes do not compel, or even favor, their parallel application, as might have been the case if they were worded identically. With some indulgence to defendant, we can count the language as basically neutral in itself.

[2, 3] However, we do view the contrasting purposes of the two parts of the Code as undermining, affirmatively and seriously, the Government's position.

In order to qualify for the tax relief of lower rates under the capital gains provisions, there must be complete divestiture of the taxpayer's interest in property of a particular nature, capital assets.[5] In such cases, there is no doubt about the actual flow of gain to the taxpayer from an outside source. Section 351, on the other hand, is not concerned with situations involving true severance of control and true flow of gain, but, rather, with instances which Congress considered as revealing illusory or artificial relinquishment of control and illusory or artificial gain. The transferor in section 351 cases is required to remain in control, albeit indirectly, after the transfer. There is, in short, a transfer in form only, a technical transfer not one of substance. The section is designed to give present tax relief for internal rearrangements of the taxpayer's own assets, accompanied by no sacrifice of control and no real generation of income for the owner—and to defer taxation until a true outside disposition is made.

Congressional interest in avoiding taxation of these "form" exchanges is reflected in the legislative records of the 1921 Act, in which the predecessor of section 351 first appeared. Dr. T. S. Adams, Treasury tax advisor and reputed father of the statute,[6] gave detailed testimony on the bill to the Senate Finance Committee. Generally, the object of proposed section 202(d)[7] was to alter the presumption of taxability in proper-

---

4. There is likewise no doubt that, as the cases cited in the text indicate, the nonrecognition of gain mandated by section 351 applies to ordinary income as well as capital gain.

5. The words "sale" and "exchange" are equivalent under the capital gains provisions. Upon the complete disposition of interest, if the transferor receives money as consideration, the transaction would be a sale. If the transferor receives property, the transaction is an exchange. See Treas.Reg. § 1.1002–1(d) (1972).

6. See Hearings on H.R. 8245 Before the Senate Comm. on Finance, 67th Cong., 1st Sess. 4 (Sept. 1–Oct. 1, 1921) (confiden-

tial print) [hereinafter cited as September Hearings]; Fox, Observations Regarding the Documentary History of the Revenue Acts for the Information of the Members of the Tax Division of the Department of Justice 2–3 in Committee Reports on the Revenue Acts 1913–38, 1939–1 Cum.Bull. (part 2) (limited ed.).

7. When enacted, this was section 202(c). The present section 351 began as section 202(c)(3) of the 1921 Act, became section 203(b)(4) of the 1924 Revenue Act, and then section 112(b)(5) of the 1928 Act. It was section 112(b)(5) under the 1939 Internal Revenue Code.

ty-for-property exchanges to one of nontaxability.[8] In the course of commenting on section 202(d)(3) of the bill (the progenitor of current section 351), Dr. Adams stated that:

> If one man incorporates his property or if a group of men incorporate their property, that mere formality, in one sense, of placing the property in corporate ownership subjects them to a tax * * *.
>
> * * * I can not believe that there is enough difference in the ownership of the property and the stock under such circumstances to justify us in recognizing taxable gain * * *.[9]

The Senate Finance Committee mirrored this attitude in its report. The section was to provide "new rules for those exchanges or 'trades' in which, although a technical 'gain' may be realized under the present law, the taxpayer actually realizes no cash profit."[10] Gain or loss would be determined at the time of subsequent "sale".[11]

■ This concentration on continuance-of-taxpayer-control as the core of 351 is prominently reflected in the opinions involving the section. For example, in American Compress & Warehouse Co. v. Bender, 70 F.2d 655 (C.A. 5), cert. denied, 293 U.S. 607, 55 S.Ct. 123, 79 L. Ed. 698 (1934), the court found that:

> [t]he statute evidences a recognition that the transaction * * * effects a change in form, but not in substance, of the beneficial interests of the transferors in the transferred property. The transaction * * * lacks a distinguishing characteristic

of a sale, in that, instead of the transaction having the effect of terminating or extinguishing the beneficial interests of the transferors in the transferred property, after the consummation of the transaction the transferors continue to be beneficially interested in the transferred property and have dominion over it by virtue of their control of the new corporate owner of it [;] * * * no third person then having acquired any beneficial interest in property which was a subject of the transfer.[12]

It is this cardinal element of continuing control by the taxpayer—i. e. that a third party does not at the time acquire substantial interest in the property transferred, or control over it—which supports the nonrecognition of gain under section 351.

■ In contrast, an important test for the capital gains provisions is whether there has been a full and complete divestiture by the taxpayer of his interests in the assets, and a corresponding acquisition of the property by a new owner. That is the precise reason why assignments of patents are held to fall under the protection of those sections, while an ordinary non-exclusive license is ruled not to be covered. The assignment represents full divestiture while a mere license bespeaks continued control of the heart of the patent by the owner. See Commissioner v. Hopkinson, 126 F. 2d 406, 409–410 (C.A. 2, 1942); E. I. Du Pont de Nemours & Co. v. United States, supra, 288 F.2d at 911–912, 153 Ct.Cl. at 287–289.[13]

---

8. September Hearings 28.

9. *Id.* 30.

10. S.Rep.No.275, 67th Cong., 1st Sess. 11 (1921), 1939–1, Cum.Bull. (part 2), 188.

11. *See* Treas.Reg. 62, art. 1567, T.D. 3295 (1922). It is at this time of actual gain (or loss), the time of complete divestiture, that a tax levy was to fall.

12. 70 F.2d at 657–658; *see* Helvering v. Cement Investors, Inc., 316 U.S. 527, 533, 62 S.Ct. 1125, 86 L.Ed. 1649 (1942); Portland Oil Co. v. Commissioner, 109 F.

2d 479, 488, 490 (C.A.1), cert. denied, 310 U.S. 650, 60 S.Ct. 1100, 84 L.Ed. 1416 (1940); Halliburton v. Commissioner, *supra,* 78 F.2d at 269; *cf.* Bittker, The Corporation and the Federal Income Tax: Transfers to a Controlled Corporation, 1959 Wash.U.L.Q. 1, 4 (1959).

13. To the same general effect, *see* Watkins v. United States, 252 F.2d 722, 723, 725 (C.A.2), cert. denied, 357 U.S. 936, 78 S. Ct. 1384, 2 L.Ed.2d 1550 (1958); Rollman v. Commissioner, 244 F.2d 634, 639, 640 (C.A.4, 1957); Watson v. United

This direct opposition in the aims of the two sets of provisions—the capital gains sections stressing the completeness of disposition by the taxpayer while section 351 is grounded in the taxpayer's continuance in control—supplies a compelling reason for putting aside, in applying the latter, capital gains formulations. Where the goals of two pieces of legislation are contradictory, it is appropriate, if the words permit, to treat them independently and to let the application of each be governed by its own separate purpose.

In two decisions the Tax Court has explicitly taken that stance. In Alexander E. Duncan, 9 T.C. 468 (1947), the taxpayers received stock in exchange for judgment claims stemming from promissory notes issued by the transferee. The Government relied upon the earlier capital gain-and-loss case of Hale v. Helvering, 66 App.D.C. 242, 85 F.2d 819 (1936), aff'g 32 B.T.A. 356 (1935), in which the transferee gave cash instead of stock in settlement of a debt. The court in *Hale* had concluded that there was no "sale or exchange" since there was no acquisition of property by the transferee. "[P]roperty in the notes as capital assets was extinguished, not sold." 85 F.2d at 821. The taxpayer therefore had no capital loss. The *Duncan* court refrained from applying this principle to its own 351 situation where stock was received by the transferor. While the surrender of obligations did not increase the assets of the obligor-

transferee, it did free them of certain liabilities. At the same time, the transferors "did not receive payment of their debts, but exchanged those debts for a continuing interest in the new corporation[;]" "the intent of section 112(b)(5) [of the 1939 Code, now section 351(a) of the 1954 Code] is to defer the recognition of gain or loss until the continuing interest of the former creditors is finally terminated as, for example, by the disposition of their stock." 9 T.C. at 471. It was this continuation-of-interest that led to the *Duncan* court's refusal to apply the capital assets "sale or exchange" test. The relationship had been altered from its original creditor/debtor form but it had not ended.[14] *See* Miller & Paine, 42 B.T.A. 586, 593 (1940). The defendant would distinguish *Duncan* on the ground that the unique nature of indebtedness —its incapability of being "transferred" back to the obligor—justified extension of the section 351 "exchange" requirement beyond narrow capital-gain-and-loss "sale or exchange" boundaries. However, the basis for the difference in result between *Hale* and *Duncan* was the element of the transferor's continuing interest, a component unaffected by the uniqueness of indebtedness.

More recently, H. B. Zachry Co., 49 T.C. 73 (1967), in deciding whether a carved-out oil payment (which did not represent substantially all the transferor's interest in the lease out of which it was payable) was "property" under sec-

States, 222 F.2d 689, 691, 692 (C.A.10, 1955); Gershwin v. United States, 153 F.Supp. 477, 478, 480, 139 Ct.Cl. 722, 723, 726 (1957); Kronner v. United States, 110 F.Supp. 730, 733–734, 126 Ct.Cl. 156, 163 (1953); A. E. Hickman, 29 T.C. 864, 872, 874 (1958); Carroll Pressure Roller Corp., 28 T.C. 1288, 1293 (1957); Rose Marie Reid, 26 T.C. 622, 632 (1956); Edward C. Myers, 6 T.C. 258, 263–264 (1946); Parke, Davis & Co., 31 B.T.A. 427, 430–432 (1934).

14. The Service has acquiesced in *Duncan*, 1948–2 Cum.Bull. 2; *see* Rev.Rul. 57–296, 1957–2 Cum.Bull. 234.

There are some observations in Jack Ammann Photogrammetric Engineers, Inc. v. Commissioner, 341 F.2d 466 (C.A. 5, 1965), which can be read as casting doubt, without referring to that case, on the *Duncan* holding, but these remarks were clearly and expressly *obiter*, at most, since the transferor's liability was not before the court of appeals, only the transferee's, and the court stated explicitly that it was not passing on the transferor's taxes. The Service and the Tax Court had agreed that the transferor was entitled to invoke section 351, and the Service has not withdrawn its acquiescence in *Duncan*.

tion 351, also rejected the Government's invocation of capital gains notions. The court pointed out that, unlike "the problem of capital gain versus ordinary income", section 351 is "concerned solely with the historic exemption of transfers to a controlled corporation where the taxpayer's interest in the property continues although the form of ownership is changed." 49 T.C. at 80.[15]

This emphasis on the taxpayer's continuous interest and continuous control, as the essence of section 351, is convincing to us, and persuades strongly against defendant's point that the requirement of full disposition as a precondition to a "sale or exchange" for capital gains purposes should be imported into 351. In view of the congressional aim in the latter provision to disregard dispositions which are merely formal and do not have economic or commercial reality, it is proper to accept, as a "transfer * * * in exchange", those dispositions which are less than substantially complete. If the transactions that most look like complete dispositions, but in reality are not dispositions at all, are free of tax because they are not deemed true dispositions, then transactions that have less appearance of complete dispositions should also be free, so long as control is maintained over what is transferred through the receipt of the transferee's stock. It would be odd to hold that a transfer had to look most like a complete disposition in order to avoid being treated for tax purposes as a complete disposition.

If Du Pont had made a full assignment of the patents to its subsidiary, the Government would agree that section 351 was entirely satisfied—and yet the taxpayer would have made no more of a true disposition to an outsider than in the present situation; in reality there would be no greater severance of control. In terms of the ends of section 351, there is no more reason for that transaction to be covered than the one we have here. In other words, in this respect the capital gains concept of a "sale and exchange" is simply irrelevant to section 351, which has a quite different purpose and an independent postulate. To insist, nevertheless, on applying that alien notion is to bring about disparate results not rationally connected to the fundamental principle behind section 351—the paradigmatic example of "mechanical jurisprudence."

Defendant's best counter-argument is that the predecessors of section 351 and the capital-gain-and-loss provisions had their joint birth in the Revenue Act of 1921 where they were placed in very close proximity, and that this juxtaposition continued for many years. Until 1954, the recognition provision for "sales or exchanges" and the exceptions to the recognition provision (including the forerunners of section 351) were positioned next to each other. *See, e. g.,* 26 U.S.C. §§ 112(a), (b) (1952). The Government draws the conclusion that, at least where a nonrecognition section uses the word "exchange",[16] Congress

15. The defendant appears to acknowledge *Zachry* as very close on its facts to the present case, but points out that the Commissioner of Internal Revenue failed to argue that there had been no "exchange"; his contention was that the carved-out oil payment was not "property".

The early case of Claude Neon Lights, Inc., 35 B.T.A. 424 (1937), is not at odds with the theory of *Zachry*. There, exclusive patent rights for a specified territory were granted to several corporations in exchange for stock in each company. The court noted that the "granting of an exclusive right * * * vests *pro tanto*

title to the patent itself in the grantee." 35 B.T.A. at 427. Thus, the grants were assignments and consequently "property susceptible of exchange within the meaning of the taxing statutes." 35 B.T.A. at 428. This holding demonstrates only that the rights granted in *Claude Neon* were within the narrow standard now advocated by the Government, and not that that narrow standard represents the sole coverage of section 351.

16. Taxpayer points out that several of the nonrecognition provisions show on their face that they can apply where there is no

intended the very same meaning to be given to that term as in the "sale or exchange" recognition provisions; those nonrecognition sections should simply be read, defendant says, as subordinate exceptions to the general provision providing for recognition of gain from a "sale or exchange".

There is obviously some force to this textual contention, but an "inference drawn from the juxtaposition and cross referencing" of related sections will be overborne by other more powerful factors. Helvering v. William Flaccus Oak Leather Co., 313 U.S. 247, 250, 61 S.Ct. 878, 85 L.Ed. 1310 (1941). We think that is true here. The elements of cognate origin and statutory juxtaposition are outbalanced by the great variance between the purposes of 351 and of the capital gains sections, and by the clear irrelevance of the concepts from the latter, which defendant invokes, to the goals and theory of the former. And, as we have already said, the bare terminology of 351 is not so identical to that of the capital gains sections that a court might feel driven by the parallelism of language to treat them as twins, despite the clear difference in purpose.[17]

## II.

■ Having rejected defendant's chief point that "transfer \* \* \* in exchange" under section 351 is tied to and has the same scope as "sale or exchange" under the capital gains sections,

we still have to determine whether 351, as an autonomous provision, covers plaintiff's transaction. That inquiry we now undertake in the light of the discussion in Part I, *supra.*

Once the capital gains concepts are seen as irrelevant, it is not difficult to find that the non-exclusive license handed over to the subsidiary was "property". Both patents themselves [18] and the exclusive licensing of patents [19] have long been considered "property" under 351. It is not a far step to include a non-exclusive license of substantial value —commonly thought of in the commercial world as a positive business asset. Unless there is some special reason intrinsic to the particular provision (as there is with respect to capital assets), the general word "property" has a broad reach in tax law. *See* Parmelee Transp. Co. v. United States, 351 F.2d 619, 623, 173 Ct.Cl. 139, 146 (1965); *cf.* Commissioner v. Gillette Motor Transp., Inc., 364 U.S. 130, 134–135, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960). For section 351, in particular, courts have advocated a generous definition of "property" (*see* H. B. Zachry Co., *supra,* 49 T.C. at 80 & n. 6 (1967); Halliburton v. Commissioner, *supra,* 78 F.2d at 268–269 (C.A. 9, 1935)), and it has been suggested in one capital gains case that nonexclusive licenses can be viewed as property though not as capital assets. *See* Fawick v. Commissioner, 436 F.2d 655, 663 (C.A. 6, 1971). *H. B. Zachry Co., supra,* held

---

"sale or exchange", but the defendant apparently limits its argument to those of the nonrecognition sections which expressly refer to an "exchange."

17. Without detailing the parties' marked disagreement over how long the Revenue Service has maintained its present position, we note that the defendant has not persuaded us that this view has been so long and so consistently maintained that we should accord any special weight to it as a long-established administrative interpretation.

We read the summary statement in B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 3.04 at 13–14 (3d ed. 1971), as merely describing the recent IRS rulings, not as giving the authors' independent views. If (as defendant insists) the treatise intends to approve the Government's position as correct, we must disagree.

18. *See* F. L. G. Straubel, 29 B.T.A. 516, 521–522 (1933).

19. Claude Neon Lights, Inc., *supra* n. 15, 35 B.T.A. at 427–428 (1937).

a carved-out oil payment—quite comparable to a non-exclusive license—to be 351 "property."

We see no adequate reason for refusing to follow these leads. Defendant now concedes that the license was "property" in the hands of the transferee, but does not agree that Du Pont gave up any "property." But, as taxpayer says, although the rights granted were "not all the rights under the patents, they were perpetual, irrevocable, and quite substantial in value." [20] Taxpayer surrendered its right to assert infringement against the subsidiary even though it retained the right to prevent others from operating under the patent. The subsidiary could proceed without fear of an infringement suit. One chunk of rights was permanently severed from the main property—the patent. In common understanding, this segment can easily be considered "property" transferred, although it was not a full cross section of the patent. Nothing in the legislative purpose of section 351 counsels a narrower reading. Congress, as we have said, wished to free taxpayers from immediate tax where they remained in control of valuable items, even though the taxpayer made some intra-business rearrangements, and to postpone the tax until complete disposition to an outsider. That objective fits this case exactly; Du Pont remains in control, and there has not as yet been a disposition to an outsider. Under the theory of the section, there is no reason for tax at this time.

Similarly with the other statutory elements of "transfer" and "exchange."

Freed of the capital gains gloss, those terms plainly apply to this transaction. Du Pont handed over something of value and received stock in return; in normal understanding there was a mutual exchange. The Senate Finance Committee's report on the 1921 predecessor of section 351, quoted *supra*, equated "exchanges" with the popular term "trades", and there is no hint that the word has any special, non-ordinary meaning. *See* Trenton Cotton Oil Co. v. Commissioner, 147 F.2d 33, 36 (C.A. 6, 1945) (construing "exchange" in a very closely related non-recognition provision as having "its ordinary meaning"). In *Alexander E. Duncan, supra,* 9 T.C. 468 (1947), the Tax Court found a "transfer * * * in exchange" in the much less normal circumstance of extinguishment of a debt. And, again, the aim of section 351 is advanced and fulfilled by applying it to taxpayer's transaction.[21]

To all of this the defendant's answer—aside from its primary contention rejected in Part I, *supra*—is that, if nonexclusive licenses are covered by 351, it will be extremely difficult to determine what portion of the transferor's basis for his patent should be carried over to a non-exclusive license, when the licensor retains the right to issue an indeterminate number of additional licenses. Generally, by section 362(a), the transferee's basis for the transferred property would be the "same as it would be in the hands of the transferor", increased by the amount of gain recognized by the transferor through the transfer. *See* P. A. Birren & Son, Inc. v. Commissioner, *supra*.

---

20. *Cf.* Meyer v. United States, 121 F.Supp. 898, 906, 129 Ct.Cl. 214, 226 (1954), cert. denied, 348 U.S. 929, 75 S.Ct. 342, 99 L.Ed. 728 (1955).

21. Du Pont has possessed virtually all of the shares of the subsidiary ever since the formation of the subsidiary, much more than the minimum 80 percent required for section 351. Du Pont's control over the French patents has not diminished over time. No third party has gained significant beneficial interest in the patents. There may possibly be situations where claims of continued control are too attenuated, where a large number of individual transferors collectively retain the minimum degree of control, to justify section 351 non-recognition since the transferors would not retain enough control individually. *See Bittker, supra* n. 12, 5. Of course, that is not at all this case.

In this particular case there is no problem of basis allocation since Du Pont claims no basis in the French patents. But we need not rest on that happenstance. Other cases have presented similar problems of proper allocation between retained and transferred value, and the courts have been able to reach satisfactory solutions.[22] True, evaluation of nonexclusive licenses is complicated by the indefiniteness of the number of licenses that may be issued. But that does not mean that it is impossible to make any appraisal. One may be able, for instance, to weigh the probability, in the specific circumstances, of more licenses being issued. Certainly in the present case, even if Du Pont had a basis for the patents, there was little prospect of its issuing licenses to other companies to produce in competition with its own subsidiary. The license granted to the subsidiary was a primary asset of the new corporation and Du Pont had a proprietary interest in the success of the venture.[23] In similar circumstances, it has been found that difficulty of evaluation should not thwart application of the statute:

> Congress was primarily concerned with the inequity, in the case of an exchange, of forcing a taxpayer to recognize a paper gain which was still tied up in a continuing investment of the same sort. * * * These considerations, rather than concern for the difficulty of the administrative task of making the valuations necessary to compute gains and losses, were at the root of the Congressional purpose * * *.[24]

Finally, the Government suggests, quite generally, that applying section 351 to this type of transaction can open up the gate to improper tax avoidance by allowing the conversion of ordinary income into capital gain. The Revenue Service has, however, officially determined under section 367 that that is not so in this case, and that provision of the Code is adequate protection where the transfer is to a foreign corporation. If the transaction is wholly domestic, there are other principles, such as those relating to the assignment of income, step transactions, and the Commissioner's power to allocate income, which have been (and no doubt will continue to be) utilized by the Service and the courts if an attempt is made to employ section 351 for an improper end outside of the congressional purpose to postpone imposition of the tax until disposition to an outsider.[25]

In this instance, we see no such possibility of tax avoidance. Du Pont's subsidiary has a zero basis in the license, under section 362(a), and its gain from use of the patent would be ordinary income, just as it would have been if Du Pont had not formed the subsidiary but had exploited the patent itself. There is no adequate reason here to refuse to apply section 351 according to its terms. Nor have we been shown any real need to adopt a wholesale prophylactic rule, rigidly excluding all transactions of this type from section 351, in order to forestall possible tax avoidance in other circumstances not before us and not even known to exist.

22. *See* Welsh Homes, Inc. v. Commissioner, 279 F.2d 391, 393–395 (C.A.4, 1960); Claude Neon Lights, Inc., *supra*, 35 B.T.A. at 442–443.

22. *Cf.* United States v. Hertwig, 398 F.2d 452, 455 (C.A.5, 1968).

24. Jordan Marsh Co. v. Commissioner, 269 F.2d 453, 456 (C.A.2, 1959) (re like kind exchanges).

25. *See* Rooney v. United States, 305 F.2d 681, 686 (C.A.9, 1962); Jacobs v. Commissioner, 224 F.2d 412 (C.A.9, 1955); Brown v. Commissioner, 115 F.2d 337, 339, 340 (C.A.2, 1940); Adoph Weinberg, 44 T.C. 233 (1965), aff'd in relevant part sub nom. Commissioner v. Sugar Daddy, Inc., 386 F.2d 836 (C.A.9, 1967), cert. denied, 392 U.S. 929, 88 S.Ct. 2282, 20 L.Ed.2d 1388 (1968).

For these reasons, we hold that section 351 applies to taxpayer's transaction, and defendant is not entitled to the offset it claims. Plaintiff's motion for partial summary judgment is granted, the defendant's cross-motion is denied, and the defendant's claimed offset with respect to this transaction is disallowed.