## FIRST NAT. BANK OF MEMPHIS v. HENSLEE.

### Civ. No. 714.

District Court, M. D. Tennessee, Nashville Division.

Oct. 3, 1947.

Allan Davis and Lewis R. Donelson, III, both of Memphis, Tenn., for plaintiff.

Courtnay C. Hamilton, Sp. Atty., Dept. of Justice, of Washington, D. C., and A. O. Denning, Asst. U. S. Atty., of Nashville, Tenn., for defendant.

DAVIES, District Judge.

. The cause was submitted upon the pleadings, evidence, exhibits, and argument of counsel for plaintiff and defendant, and, after due consideration thereof, the Court enters its Findings of Fact and Conclusions of Law, as follows:

### Findings of Fact

1. Albert H. Adams, Sr., died on July 8, 1943, a resident of Memphis, Shelby County, Tennessee, and on July 14, 1943, his last will and testament was admitted to probate by the Probate Court of Shelby County, Tennessee, and the First National Bank of Memphis duly qualified and was appointed as executor of his estate and is still acting as such.

2. After examination of the estate tax return filed for said estate by the executor, additional federal estate taxes, penalties and interest in the amount of $15,092.04 were assessed and thereafter paid on October 23, 1945, by the said executor to Lipe Henslee, Collector of Internal Revenue for the State of Tennessee, defendant in this case, who is still in office. The executor had previously paid, prior to October 8, 1944, federal estate taxes of $10,227.38.

3. The additional federal estate taxes, penalties and interest assessed against decedent's estate arose out of the inclusion in decedent's gross taxable estate of an increased value for decedent's interest in the Memphis Serum Company in the amount of $33,980.83, representing the alleged good will of said business and of certain property having a value of $18,000 which decedent had transferred to his wife, Ruth B. Adams, in November, 1942, approximately eight months prior to his death.

4. The Memphis Serum Company was founded by the decedent in 1922 and continuously operated by him as a sole proprietorship from that time until his death. The company was engaged in the distribution and sale of animal serums and veterinary supplies, particularly hog cholera serum. It had no exclusive franchises or sales agencies and was not engaged in manufacturing. It owned no patents, trademarks or secret formulas. Its merchandise was purchased in the open market and sold in general competition primarily to county drugstores, county agents, agriculture teachers and farmers. Sales were made principally through personal solicitation, advertising, and a small percentage on the premises. The confidence of the customer in the owner or salesman was the principal factor in most of its repeat sales. The company ordinarily sold its product with the name of the manufacturer displayed thereon and the inscription "packed for" or "distributed by Memphis Serum Company." Labels bearing the special inscription were unobtainable during the war and this practice was discontinued some time prior to decedent's death.

5. The success of the Memphis Serum Company was due principally to the experience, ability, and personality of the decedent. Prior to founding the Memphis Serum Company, he had been engaged in the manufacture of serum. During the operation of the company, he had established a large personal following throughout the trade territory and particularly among county agents and agriculture teachers. He was, likewise, well-known to the manufacturers of serum and veterinary supplies from whom his purchases were made.

6. In 1935 the decedent's son-in-law, Fay Dreppard, was employed in the business, and he assumed the duties of traveling and the personal solicitation of customers. Thereafter, decedent travelled infrequently, and Fay Dreppard rapidly became acquainted with all the company's customers and established a following of his own in the territory. At the time of decedent's death, he was better known to a large majority of the customers of the Memphis Serum Company than the decedent.

7. In 1938 the decedent's son, Albert H. Adams, Jr., was employed in the business, and he assumed the management of the office. At the time of decedent's death, both Fay Dreppard and Albert H. Adams, Jr., were well-known to all the manufacturers from which the Memphis Serum Company purchased its merchandise and they enjoyed the personal confidence of the great majority of its customers.

8. During the last years of decedent's life and particularly after the entry of his son and son-in-law into the business, its sales showed a decided trend away from the county agent and agriculture teachers which had formerly constituted the bulk of its customers, to drugstores and individual farmers, so that the latter constituted the substantial majority of its customers by the time of decedent's death. This trend was accompanied by a sharp influx of new competitors, particularly the large drug companies.

9. The Memphis Serum Company had no contracts with any of the manufacturers from which it secured serum or veterinary supplies and its source of supply could have been cut off at any time by the decision of these companies to enter into the distribution of their own products. Likewise, serum and veterinary supplies were available to any competitor on the same terms at which the Memphis Serum Company could secure them.

10. The Memphis Serum Company had no contracts with Fay Dreppard and Albert H. Adams, Jr., guaranteeing their services. They were free to leave at any time and take other employment or open a rival serum company.

11. The Memphis Serum Company was a business peculiarly dependent for its success upon the personal skill, ability and experience of its owner and its salesmen, and the confidence which a customer has in such owner or salesman.

12. After the death of decedent, Fay Dreppard and Albert H. Adams, Jr., could have established a rival serum company and undoubtedly obtained the patronage of

a large portion of the customers of the Memphis Serum Company.

13. The annual net profits and gross sales of the Memphis Serum Company from 1930 to 1942 were as follows:

Annual Net Profits

| 1930 | $ 6,130.47 |
|------|-----------|
| 1931 | 1,529.16 |
| 1932 | 8,970.05 |
| 1933 | 6,932.49 |
| 1934 | 8,018.31 |
| 1935 | 15,806.00 |
| 1936 | 16,468.75 |
| 1937 | 19,470.60 |
| 1938 | 28,627.04 |
| 1939 | 25,132.10 |
| 1940 | 13,929.33 |
| 1941 | 25,002.63 |
| 1942 | 23,654.86 |
| July 8, 1943 | 26,371.86 |

Gross Sales

| 1930 | $30,556.61 |
|------|-----------|
| 1931 | 28,553.91 |
| 1932 | 39,153.14 |
| 1933 | 40,044.08 |
| 1934 | 33,560.79 |
| 1935 | 54,392.54 |
| 1936 | 80,223.07 |
| 1937 | 77,786.71 |
| 1938 | 115,391.73 |
| 1939 | 120,360.78 |
| 1940 | 77,330.55 |
| 1941 | 122,668.54 |
| 1942 | 191,358.87 |
| July 8, 1943 | 167,926.89 |

14. The sale of animal and livestock serum is directly proportionate to the number of livestock in the territory in any year, and the sales and profits of a serum distributing business will fluctuate directly with this factor. In addition, the sale of any type of serum may be greatly increased by an epidemic requiring its use in the prevention or treatment of the disease.

15. The Memphis Serum Company established a branch at the South Memphis Stockyards in May of 1942, a little over one year prior to decedent's death. Fay Dreppard operated this branch except while absent on sales trips.

16. Considering the nature and value of the services which the deceased rendered to the Memphis Serum Company, his experience, ability, and personal following in the territory, a salary of $11,000 per year would be reasonable compensation for his services.

17. The Memphis Serum Company had a good will value above the actual value of its assets which was $49,851.09 at the time of decedent's death, of $25,000.

18. Decedent was survived by his wife, Ruth B. Adams, and their two children, Patricia Ann Adams, aged 13 years, and Alberta Jean Adams, aged 15 years, and by two children of a previous marriage, Bonnell Adams Dreppard and Albert H. Adams, Jr. In November of 1942, the two children of his first marriage were themselves married and self-supporting; the two children of his second marriage were still minors. He left an estate of approximately $140,000 including cash in excess of $20,000.

19. Decedent's wife was a number of years younger than he, and decedent was extremely jealous of her. This jealousy had caused certain domestic difficulties. Anxious to smooth over their difficulties, he agreed to make these gifts. Together they visited a lawyer, who was a personal acquaintance, and requested him to prepare the necessary papers.

20. On November 19, 1942, decedent executed an absolute and irrevocable deed of gift to his wife, Ruth B. Adams, covering the residence in which they were living at 657 West Drive, Memphis, Tennessee, including its furnishings valued at $17,000, and the Cadillac automobile which she had been using personally, valued at $1,000.

21. Upon the suggestion of the attorney, decedent at the same time executed a will to replace an earlier one which had been misplaced and was, moreover, outmoded.

22. At the time decedent made these gifts and for approximately five months thereafter, he was apparently and to his own best knowledge in good health. He had recently expanded his business and was still active in its management. He was planning to build a new home in the country and had already purchased the site. He was contemplating the purchase of a winter home in Florida. He was in

excellent spirits and had no thought of dying.

23. Prior to May of 1943, just two months before his death, decedent went out socially on frequent occasions, entertained considerably, and travelled extensively both on business and pleasure trips. Up to that time he continued active in his business.

24. During his last illness, decedent always thought he was going to get well. He was planning trips with his friends and maintained a keen interest in the operation of business. He died of a cancer on July 8, 1943. The nature of his illness was not determined until less than a month before his death, and decedent died without any knowledge of his condition.

25. In making the aforesaid gifts to his wife on November 19, 1942, decedent was not impelled by motives associated with death but rather from motives of life.

26. The transfers to his wife of the residence and automobile, having a total value of $18,000, were not made in contemplation of death.

27. The correct federal estate tax liability due on the Estate of Albert H. Adams, Sr., was $17,027.25, on which there was interest due of $424.99, making a total liability of $17,452.24 for federal estate taxes and interest.

28. The plaintiff is entitled to a refund of $7,867.17 for federal estate taxes, penalties and interest erroneously, illegally and wrongfully collected plus interest thereon from October 26, 1945, according to law.

## Conclusions of Law

1. The Commissioner of Internal Revenue erred by including in the value of decedent's gross estate for federal estate tax purposes an amount of $33,980.83 representing the good will of the Memphis Serum Company, a business solely owned and operated by decedent.

2. For federal estate tax purposes, the proper valuation of decedent's interest in the Memphis Serum Company at the time of his death was $74,851.09 which included an amount of $25,000 for the good will of said business.

3. The Commissioner of Internal Revenue erred by including in the value of decedent's gross estate for federal estate tax purposes an amount of $18,000 representing certain property which decedent had transferred to his wife, approximately eight months prior to his death.

4. The transfer of the residence and automobile which decedent made to his wife in November of 1942 was not made in contemplation of death, and the value of this property is not includible in decedent's gross estate at the time of his death.

5. The Commissioner of Internal Revenue erred by assessing against and collecting from plaintiff the sum of $15,092.04 for a deficiency of federal estate taxes, interest and penalties. Whereas, the correct deficiency of federal estate taxes due on decedent's estate was $6,799.87 plus interest of $424.99 thereon.

6. The plaintiff should be refunded the amount of $7,867.17 for federal estate taxes, interest and penalties wrongfully, illegally and erroneously collected from it, plus interest thereon from October 23, 1947, according to law.

Judgment accordingly.