**FIRST VICTORIA NATIONAL BANK,
Independent Executor under the Will of
T. J. Babb, Deceased, Plaintiff-Appellee,**

v.

**UNITED STATES of America,
Defendant-Appellant.**

**No. 78–1596.**

United States Court of Appeals,
Fifth Circuit.

July 9, 1980.

M. Carr Ferguson, Asst. Atty. Gen., Ann Belanger Durney, Gilbert E. Andrews, Act. Chief, John F. Murray, William S. Estabrook, III, U.S. Dept. of Justice, Tax. Div., Washington, D. C., for defendant-appellant.

Guitard & Henderson, Joseph P. Kelly, Richard Henderson, Victoria, Tex., for plaintiff-appellee.

Before WISDOM, GOLDBERG and HENDERSON, Circuit Judges.

GOLDBERG, Circuit Judge:

This case presents a question of first impression: whether "rice history acreage" interests under the system of rice allotments established by sections 351 to 356 of the Agricultural Adjustment Act of 1938, 52 Stat. 31 (codified as 7 U.S.C.A. §§ 1351–1356 (West 1973)) ("the Act") constitute "property" includable in a decedent's gross estate under sections 2031 and 2033 of the Internal Revenue Code of 1954.[1] Because an understanding of the rice allotment system is necessary to a full understanding of the facts of this case, we will first discuss the rice allotment program and the interests which exist thereunder.

### I. *The Rice Allotment Program*

The rice allotment program, as it was structured until 1975[2] from its inception in 1938, was a fairly complicated statutory and regulatory scheme. The Secretary of Agriculture is empowered to set a national acreage allotment for rice for each calendar year. *See* 7 U.S.C.A. § 1352 (West 1973)

---

1. I.R.C. § 2031 provides in relevant part:

  The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.

 26 U.S.C.A. § 2031 (West 1979).

  I.R.C. § 2033 provides:

  The value of the gross estate shall include the value of all property to the extent of the

interest therein of the decedent at the time of his death.

 26 U.S.C.A. § 2033 (West 1979).

2. The Rice Production Act of 1975, Pub.L.No. 94–214, 90 Stat. 181, shifted rice production in this country from a closed system to an open system by suspending operation of the prior scheme of regulation for crop years 1976 and 1977. Later legislation extended this suspension through the 1981 crop year. *See* Act of Sept. 29, 1975, Pub.L.No. 95–113, 91 Stat. 943.

(since amended).[3] The national allotment is then apportioned among the rice-producing states, 7 U.S.C.A. § 1353(a) (West 1973) (operation currently suspended, *see* n. 2 *supra*), and each state in turn apportions its quota among the farmers of that state as provided in Section 1353(b).

Section 1353(b) authorizes two different methods of allocating a state's acreage among its farmers. These methods are called "producer" allotments and "farm" allotments. The "producer" method was employed in Texas during the years relevant to this case.[4] Under this method, a state's acreage is apportioned to "farms owned or operated by persons who have produced rice in the [s]tate in any one of the five calendar years immediately preceding the year for which such apportionment is made on the basis of past production of rice in the [s]tate by the producer on the farm taking into consideration the acreage allotments previously established in the [s]tate for such owners or operators; abnormal conditions affecting acreage, land, labor, and equipment available for the production of rice, crop rotation practices, and the soil and other physical factors affecting the production of rice . . .." 7 U.S.C.A. § 1353(b) (West 1973) (suspended).[5]

The Secretary of Agriculture is authorized by Section 1354(a) to determine whether the total supply of rice in a marketing year will exceed the normal supply for that year. When he makes this determination, market-ing quotas go into effect for the calendar year unless more than one-third of the farmers engaged in the production of the prior year's crop oppose the quotas in a national referendum conducted by the Secretary by secret ballot. *See* 7 U.S.C.A. § 1354(b) (West 1973) (suspended). The marketing quota for a farm is the "actual production of rice on a farm less the normal production of the acreage planted to rice on the farm in excess of the farm acreage allotment." 7 U.S.C.A. § 1355 (West 1973) (suspended). The excess of rice produced is called "farm marketing excess," *id.*, and is subject to a penalty of 65 percent of the parity price per pound for rice as of June 15 of the calendar year in which the crop is produced. *See* 7 U.S.C.A. § 1356(a) (West 1973) (suspended). The result of these provisions is that in any year in which the Secretary of Agriculture determines that a surplus of rice exists and two-thirds of the nation's rice farmers concur, the possessor of a rice allotment may market a quantity of rice free from a substantial tax levy.

The statutory scheme also created an interest which is referred to as "history of rice production" or "rice history acreage."[6] *See* 7 U.S.C.A. § 1353(f) (West 1973) (suspended). This interest gives its owner the right to be apportioned rice acreage as if the owner himself had produced in prior years the rice that was produced in those years by the transferor of the interest.

---

3. The national acreage allotment is that acreage needed to produce a supply of rice which together with estimated carry-over from the prior marketing year, will make available the normal supply of rice. *See* 7 U.S.C.A. § 1352 (West 1973) (since amended). Although the national acreage allotment may vary from year to year, it cannot be less than the allotment for 1956. *See* 7 U.S.C.A. § 1353(c)(6) (operation suspended).

4. Other "producer" states include Arizona, California, Florida, South Carolina, Tennessee, and part of Louisiana. 7 C.F.R. § 730.62(11) (1974) (repealed).

5. The "farm" allotment method requires approval by the Secretary of Agriculture. This method apportions acreage "to farms on which rice has been produced during any one of [the five prior] years," using "past production of rice on the farm and the acreage allotments previously established for the farm" instead of "past production of rice by the producer and the acreage allotments previously established for such [producer]" as the major factors determining acreage allotments. *See* 7 U.S.C.A. § 1353(b) (West 1973) (suspended). "Farm" states include Arkansas, Illinois, Mississippi, Missouri, North Carolina, Oklahoma, and part of Louisiana. *See* 7 C.F.R. § 730.62(5) (1974) (repealed).

6. "Rice history acreage" appears to be a term of art created by the statutory draftsmen by transposing the words "acreage" and "history" in the phrase "rice acreage history," which can be easily understood to mean the history of the producer's acreage of rice production.

The statutory scheme provides for the transfer of this interest. When a rice producer in a "producer" state dies, the transfer of his "history of rice production" is governed by 7 U.S.C.A. § 1353(f)(1) (added by Act of March 6, 1962, Pub.L.No. 87–412, 76 Stat. 20) (currently suspended), which provides:

> If a producer in a [s]tate in which farm rice acreage allotments are determined on the basis of past production of rice by the producer on the farm, dies, his history of rice production shall be apportioned in whole or in part among his heirs or devisees according to the extent to which they may continue, or have continued, his farming operations, if satisfactory proof of such succession of farming operations is furnished the Secretary.

If a rice producer in a producer state wishes to transfer his "rice history acreage" to another, subsections 1353(f)(2) and (3) govern.[7] A producer may transfer his interest to other members of his family with relative ease, see id., subsection (f)(2), but more stringent conditions apply when the transferee is not a member of the transferor's family. In this case, the transferor must permanently withdraw from rice production; and the transferee must have prior rice-producing experience, must acquire the entire farming operation pertaining to rice, except for land and irrigation equipment permanently attached to the land, and must actually plant at least 90 percent of his total producer rice acreage allotment in at least three of the four years following the transfer. See id., subsection (f)(3).

It must be understood that a "producer rice allotment" is an interest entirely different from "rice history acreage." A "producer rice allotment" for a year gives a rice producer the right to grow and market in that year a number of acres of rice free from payment of the penalty levied by Section 1356. This right only relates to the year of the allotment. "Rice history acreage," in contrast, is an interest that entitles its owner to receive "producer rice allotments" each year that the rice allotment program is in operation. At least ninety-seven percent of a state's acreage allotment for a year must be apportioned to farms operated by persons who produced rice in the state in at least one of the five prior years. See 7 U.S.C.A. § 1353(b), supra. Thus, possession of "rice history acreage," although not an absolute statutory prerequisite to the receipt of "producer rice allotments," substantially increases the likelihood of receiving "producer rice allotments" each year.

The statutory scheme appears to require that a national acreage allotment be set and

---

**7.** 7 U.S.C.A. § 1353(f) (West 1973) (suspended) provides in relevant part:

> . . . . .
>
> (2) If a producer in a State in which farm rice acreage allotments are determined on the basis of past production of rice by the producer on the farm withdraws in whole or in part from rice production in favor of a member or members of his family who will succeed to his farming operations that portion of his rice history acreage as may be ascribed to such withdrawal may be transferred to such family member or members, as the case may be, if satisfactory proof of such relationship and succession of farming operations by such family member or members is furnished the Secretary.
>
> (3) If a producer in a State in which farm rice acreage allotments are determined on the basis of past production of rice by the producer on the farm permanently withdraws from rice production, his rice history acreage may be transferred to another producer or producers who have had previous rice-producing experience, provided the following conditions are met: (i) The transferee must acquire, except for land, the entire farming operation pertained to rice, including all production and harvesting equipment, any irrigation equipment not permanently attached to the land; and (ii) the transferee must actually plant at least 90 per centum of his total producer rice acreage allotment, including the allotment determined on the basis of the rice history acreage acquired from the transferor for at least three out of the next four years following the transfer. Failure by the transferee to comply with condition (ii) above shall result in cancellation of the transfer of the rice history acreage. The transferor of rice acreage history under this subsection shall not be eligible for a producer rice acreage allotment for any year subsequent to such transfer, except to the extent that such allotment may be based on rice history acquired in a year (subsequent to the transfer) for which rice marketing quotas are not in effect.
>
> . . . . .

then apportioned in each year. *See* 7 U.S.C.A. §§ 1352 & 1353, *supra.* However, in years in which farm marketing quotas are not in effect, the allotment program has no effect because there is no penalty for growing rice without allotments in those years. Since the administrative costs of apportioning the allotments in such a year would serve no useful purpose, it is likely that no allotments would be issued in a year in which marketing quotas were not in operation.[8]

**8.** Despite the apparently mandatory language of section 1352, *supra*, the statutory draftsmen may have contemplated that no allotments would be established in a year in which quotas were not in effect, since section 1353(f)(3) refers to "a year . . . for which rice acreage allotments are not in effect."

**9.** 7 C.F.R. § 730.72 (1973) (repealed) provides: Allocation of producer allotments to farms.

(a) *Request for allocation.* Each producer who desires to have all or any part of his producer allotment taken into consideration in the establishment of the farm allotment for any farm on which he will be engaged in the production of rice in the current year shall, not later than the final date set forth herein, file a request with the county committee for allocating his producer allotment as determined under §§ 730.68 and 730.69 or § 730.-71, as applicable, to such farm or farms, if his allotment acreage is to be considered when establishing the farm allotment. Each request shall be in writing and insofar as the producer has personal knowledge, contain the name (or code number) of the State and county in which the farm is located and the farm number; the total acres in the farm; the cropland acres; the name and address of the farm operator and the name and address of the farm owner where different from the farm operator; the name and address of the applicant; the location of the farm; the applicant's producer allotment; the allotment to be allocated to the farm; the applicant's interest in the rice crop to be produced on the allotment allocated to the farm by virtue of furnishing the land, labor, water, equipment, or producer allotment, and the applicant's percentage share in the production from such acreage.

(b) *Filing date.* The final date for the filing of an application or the correction of any application previously filed under paragraph (a) of this section shall, except as provided herein, be May 1 of the current year. If a producer is unable to file his application on or before this date because of (1) an error on the part of an employee of the county or State committee or (2) physical reasons beyond his control, including inability to plant

Although the statutory scheme makes no provision for the transfer of "producer rice allotments," it does contemplate and provide for the transfer of "rice history acreage." *See* pp. 1097–1098, *supra.* The regulations promulgated by the Department of Agriculture which were in effect in 1973, however, permit the transfer of producer rice allotments.[9] They contain no separate provisions for the transfer of "rice history acreage;" however, they

his intended acreage on the farm indicated, an application accompanied by his written certification giving his reasons for failure to file previously or for correcting a previously filed application may be accepted for further consideration. If the county committee, with the approval of the State executive director, determines from the facts and circumstances that the producer's failure to file previously or his reason for changing an application is because of an error on the part of an employee of the county or State committee, or because of physical reasons beyond his control, the application may be accepted as being timely filed. Any application for the allocation of producer allotment to a farm that is not timely filed in accordance with the provisions of this section shall be disapproved and such allotment cannot be considered when the allotment for the farm is established.

7 C.F.R. § 730.76 (1973) (repealed) provides: Succession of interest in producer allotments.

(a) *Conditions for withdrawal from the production of rice.* (1) If a producer dies or withdraws from the production of rice, his allotment and related history acreages during the applicable base period may be transferred under the provisions of this section to another person or persons: *Provided,* That if a producer has a contract or agreement under a land use adjustment program in effect on a farm to which he allocated rice allotment that was planted during the 2 years prior to entering into such contract or agreement and he is currently receiving a payment under such program, his producer rice allotment and related history shall not be available for transfer under the provisions of this section for the duration of such contract or agreement unless such contract or agreement is modified or terminated as provided under regulations applicable to the land use adjustment programs: *Provided further,* That a person for whom a new producer allotment is approved shall be engaged in the production of rice in at least four out of the next 5 years following approval before his allotment for the current year becomes available for trans-

fer under the provisions of paragraph (b)(2), (3), or (4) of this section.

(2) Each such transfer under this section shall be contingent upon furnishing in writing on or before April 1 of the current year all pertinent information requested by the county committee. Each such transfer will be subject to the approval of the county committee and a representative of the State committee. The transferor's signature date shown on the notice of withdrawal shall be the effective date of the transfer: *Provided,* That the county committee and a representative of the State committee find that the conditions applicable to the transfer of allotment under this section have been met. If it is found that any of the required conditions has not been met, the notice of withdrawal shall be canceled and the interested producers shall be so notified in writing showing reasons for cancellation of the transfer of allotment.

(3) If a producer failed to file an application for transfer of allotment and related history acreage on or before April 1 because of (i) physical reasons beyond his control; (ii) an error on the part of an employee of the county or State committee, or (iii) failure of an employee of the county or State committee to furnish, upon request, full information relating to transfers, an application accompanied by his written certification giving his reasons for failure to file previously may be accepted for further consideration. Any application filed after April 1 of the current year shall be considered for approval in the same manner as applications for the allocation of producer allotment to farms filed under the provisions of paragraph (b) of § 730.-72.

(b) *Withdrawal provisions.* (1) If a producer dies, his current allotment and related rice history acreage during the applicable base period shall be apportioned in whole or in part among his heirs or devisees according to the extent to which they may continue or have continued, his farming operations. The heirs or devisees, or their representative, shall furnish the county committee in writing at the earliest practicable date, the names and addresses of the heirs or devisees and the extent each will continue the farming operations of the deceased. The percentage of the total allotment of the deceased that each will receive shall be determined on the basis of the information furnished by the heirs or devisees and any other pertinent information. The rice history acreages credited to the deceased during the applicable base period shall be divided among the heirs or devisees in the same proportion that the allotment is divided.

(2) If a producer withdraws in whole or in part from the production of rice in favor of a member or members of his family who will succeed to his farming operations, that portion of his current allotment and related rice history acreage during the applicable base period as may be ascribed to such withdrawal, may be transferred to such family member or members. For the purpose of this subparagraph (2), a member of the transferor's family shall be limited to the transferor's spouse (including a divorced spouse if the transfer is made in connection with the divorce proceedings), father, mother, brother, sister, son, daughter, brother-in-law, son-in-law, grandson, granddaughter, nephew, niece, or any other relative who would be entitled to succeed to the transferor's estate upon death, intestate, according to the laws of the State in which the transferor resides. The transferor shall furnish the county committee in writing at the earliest practicable date, the names and addresses of the transferees, their relationship to him and the extent to which he is to be succeeded in his farming operations by them. The current allotment and related rice history acreages credited to the transferor during the applicable base period shall be divided among the transferor, when applicable, and the transferees in accordance with the transferor's request.

(3)(i) If a producer permanently withdraws from the production of rice as provided in this subparagraph (3), his allotment current at the time of such withdrawal and related rice history acreage during the applicable base period may be transferred to another producer or producers who have had previous rice producing experience, provided the transferee or transferees acquire, except for land, the transferor's entire rice farming operation, including rice production and harvesting equipment and irrigation equipment not permanently attached to the land, except such equipment which will be used by the transferor for farming operations other than rice production, as determined by the county committee with the concurrence of the State committee. The transferor at the earliest practicable date shall inform the county committee in writing of his intention to withdraw from the production of rice and the crop year for which the withdrawal is to become effective. He shall also furnish the names and addresses of the persons who will succeed him in his rice farming operations and the percentage of his current allotment that each person is to receive. The related rice history acreages credited to the transferor during the applicable base period shall be divided among the transferees in the same proportions that the allotment is divided. To qualify as having had previous rice producing ex-

contemplate that a producer's rice acreage history will always be transferred along with the producer's rice allotments. *See* 7 C.F.R. § 730.76, n.9 *supra.* The regulations create a "season" for trading in rice allotments which runs from the issuance of the allotments (allotments appear to have ordinarily been issued on approximately January 1) until the end of March. *See* 7 C.F.R. §§ 730.72 & 730.76, *supra.* For a transfer of an allotment to be effective, a number of conditions must be met, one of which is that certain information must be furnished the county committee by April 1. *See* 7 C.F.R. § 730.76(a)(2), *supra.* The April 1 date can be extended, but only if certain fairly stringent conditions are met. *See id.* § 730.76(a)(3), § 730.72(b). Ordinarily, the allotments must be allocated to the producer's farms by May 1 or they will not be taken into consideration in the establishment of the marketing quota for each farm, although the May 1 date will also be waived under certain circumstances. *See id.* § 730.-72(b).

II. *Facts and Proceedings Below*

With the statutory and regulatory framework in mind, we turn to the facts and procedural history of this case. The facts are undisputed. The decedent, T. J. Babb, died on July 4, 1973. He had been engaged for many years in the production of rice, and had annually been granted rice allotments under the Act since at least 1958. By notices dated December 1, 1972, and May 1, 1973, Babb was issued producer rice allotments of 1208.3 acres. Prior to the deadline of May 1, 1973, in compliance with the applicable regulations, Babb allocated his 1973 allotment to farms on which he intended to produce rice for the crop year 1973.

At the time of his death, no producer rice allotment for 1974 had been determined for or issued to Babb. After Babb's death, by notice dated March 28, 1974, a producer rice allotment of 1142.6 acres was issued to his estate.

The estate tax return filed by the First Victoria National Bank, appellee here, as executor included no amount for either the value of decedent's interests in the rice allotment program or the value of the rice crop growing on July 4, 1973. After examination of the return by an agent of the

perience as referred to in this subparagraph (3), the transferee must have actually participated in producing, harvesting, and marketing one or more crops of rice as a producer.

(ii) In order for the transfer to remain effective, the transferee must actually plant or cause to be planted at least 90 percent of his producer allotment (after release and before reapportionment), including the allotment determined on the basis of the rice history acreage acquired from the transferor, for at least three out of the next 4 years following the transfer. If the transferee fails to comply with this minimum planting provision, the transfer shall become invalid and the county committee shall reduce the transferee's allotment, for the crop year immediately following the year of such failure, by the percentage that the acquired acreage is of the allotment, including the acquired acreage for which there is failure to comply, established for the producer for the year of acquisition. The rice history acreages credited to the transferee for each year of the period the transfer was in effect shall be reduced by the same percentage that the allotment is reduced.

For the purpose of this subdivision (ii) the term transferee shall include the person or persons who are the successor(s) in interest to the transferee's producer allotment under subparagraphs 1, 2, and 4 of this paragraph (b), and the successor corporation where a corporate transferee is merged or consolidated with another corporation.

(4) If a partnership is dissolved, the partnership's current allotment and related history of rice production shall be divided among the partners in such proportion as agreed upon in writing by the partners or if the partners are unable to agree, among the partners in the same proportion that each partner had an interest in the partnership: *Provided,* That if a partnership was formed in a year in which allotments were in effect and is dissolved in less than three consecutive crop years after the partnership became effective, the allotment established for the partnership and rice history acreage credited to the partnership for each of the years during its existence shall be divided among the partners in the same proportion that each partner contributed to the allotment established for the partnership at the time such partnership was formed and the rice history acreage credited to the partnership for the remaining years of the applicable base period shall revert to the person to whom it was originally credited.

Internal Revenue Service, the Service determined that items of $50,000, representing the value of crops growing on July 4, 1973, and $285,600,[10] representing the value of decedent's rice producer allotment and rice production history, were includable in the gross estate.

Appellee paid, under protest, the deficiency of $89,265.00 plus interest created by inclusion of the item valued at $285,600,[11] and filed a claim to recover that deficiency plus interest. Appellee asserted the rice allotment system created no "property" possessed by decedent on the date of his death, and, alternatively, that if any such "property" was includable in the estate, the "property" had no market value on the date of his death. The claim was denied, and this suit was filed by appellee in federal district court. Jurisdiction is based on 28 U.S.C. § 1346(a)(1), 28 U.S.C.A. § 1346(a)(1) (West 1976).

Each party filed a motion for summary judgment.[12] Annexed to its motion, the United States filed an affidavit of its trial attorney enumerating 31 sales of rice allotments in Texas in 1973. All of these sales occurred in the months of January, February, and March, at prices which ranged from $192 to $300 per acre.

The trial court granted appellee's motion, ruling that (1) on July 4, 1973, decedent's 1973 rice allotment was "used up" and its value merged with the growing crops (which were valued at $50,000), (2) decedent's history of rice production did not constitute property for estate tax purposes, and (3) there was no transfer of rice history upon Babb's death because any transfer was conditional upon subsequent events; to wit, that the transferees continue the rice farming operations. *See First Victoria Na-*

*tional Bank (Babb) v. U.S.,* 443 F.Supp. 865 (S.D.Tex.1978).

### III. *Is the value of "rice history acreage" includable in decedent's estate?*

The proper resolution of this appeal turns on whether "rice history acreage" is "property" within the contemplation of I.R.C. §§ 2031 & 2033, n. 1 *supra.* As we attempt to resolve this question, we necessarily must wrestle with the meaning of the label "property." Documentation of the history and derivation of many interests which are today denominated "property" would require philosophers, professors of jurisprudence, and scholars of economics to call upon their full erudition and exegetic talents. The shelves of our jurisprudence are tomed with obituaries of species of property long ago tolled. Announcements of the nascence of other species which were unheard of and unspeculated upon centuries ago populate further volumes.

Although the varieties of property may not be infinite, any attempt to enumerate every species of property would beggar the mind and intellect of even the wisest of persons. Avoiding this Sisyphian endeavor, we embark on a Delphian one. As we begin, we must remind ourselves that "property" is an expansionist term. Its mooring is contemporary rather than historical.

The attempt to define "property" is an elusive task. There is no cosmic synoptic definiens that can encompass its range. The word is at times more cognizable than recognizable. It is not capable of anatomical or lexicographical definition or proof. It devolves upon the court to fill in the definitional vacuum with the substance of the economics of our time.

10. The figure of $285,600 was obtained by multiplying the value per acre of rice allotment for 1973 (with related history of rice production), $250, by the number of acres of rice allotments received by decedent's estate in 1974, 1142.6. The $250 figure was arrived at by the United States by a study of the prices at which 1973 rice allotments and related history were sold in 1973.

11. Appellee did not challenge the inclusion of the $50,000 representing the value of the growing crops.

12. The United States withdrew its motion when it became apparent that, even if a value for decedent's rice allotments and rice production history was properly includable in the gross estate, a disputed question of fact remained concerning the valuation of those interests.

The Restatement of Property uses the word "property" to denote legal relations between persons with respect to a thing, *see* 1 Restatement of Property 3 (1936), but does not attempt to define which "things" constitute "property." The Supreme Court has said that "[t]he accurate delimitation of the concept 'property' would afford a theme especially apposite for amplificative philosophic disquisition." *Gleason v. Thaw*, 236 U.S. 558, 660, 35 S.Ct. 287, 288, 59 L.Ed. 717 (1915). Legal encyclopedias can provide us an interminable string of definitions suggested by various courts. *See, e. g.*, 73 C.J.S. *Property* § 1 (1951).

Some kinds of property known to the English common law never made the transatlantic voyage to our shores. Other kinds have died out over the years, and new forms have taken their place. Blackstone once attempted to enumerate the varieties of incorporeal hereditaments, listing ten: advowsons, tithes, commons, ways, offices, dignities, franchises, corodies, annuities, and rents. 2 W. Blackstone, Commentaries * 21. Even these ten could be further subdivided; the general term advowson,[13] for example, includes advowson appendant, advowson in gross, advowson presentative, advowson donative, advowson collative, advowson of the moiety of the church, a moiety of advowson, and advowson of religious houses. *Id.* at 22; 1 Bouvier's Law Dictionary 157 (1914).

These types of property are no less foreign to contemporary American law than the statutorily-created interests known as "producer rice allotments" and "rice history acreage" would have been to Blackstone. "Property" evolves over time. It can be described as the bundle of rights[14] attached to things conferred by law or custom, or as everything of value which a person owns that is or may be the subject of sale or exchange. *See* 73 C.J.S. *Property* § 1 (1951). Both of these definitions contemplate the possibility that law or custom may create property rights where none were earlier thought to exist.

An example of this development can be seen in the "right of publicity." Once thought to be a personal, non-assignable right emanating from the right of privacy, the "right of publicity" evolved into a legally-protected, transferable interest. *See, e. g., Haelan Laboratories v. Topps Chewing Gum*, 202 F.2d 866, 868 (2d Cir. 1953). Recently, courts have been faced with the next question relating to the "right of publicity"—whether this right is devisable. Some courts have held that under some circumstances the right survives death and can be devised, *see, e. g., Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir. 1978); *Hicks v. Casablanca Records*, 464 F.Supp. 426 (S.D.N.Y.1978); others that the right terminates at death, *see, e. g., Memphis Development Foundation v. Factors Etc., Inc.*, 616 F.2d 956 (6th Cir. 1980); *see generally* Flecher & Rubin, *Privacy, Publicity, and the Portrayal of Real People by the Media*, 88 Yale L.J. 1577 (1979).

In the "right of publicity" context, the courts have realized that the tag "property" expresses a legal conclusion rather than any independent meaning, *see Haelan Laboratories, supra*, 202 F.2d at 868, but have nevertheless labelled the right "property." *See Factors Etc., Inc. v. Pro Arts, Inc., supra*, 579 F.2d at 221. An interest labelled "property" normally may possess certain characteristics: it can be transferred to others; it can be devised and inherited; it can descend to heirs at law; it can be levied upon to satisfy a judgment; it comes under the jurisdiction of a bankruptcy court in a bankruptcy proceeding;[15] it will be protect-

---

13. An advowson is the right to nominate a minister to officiate in a church. 2 W. Blackstone, Commentaries * 21.

14. *See generally Kaiser Aetna v. United States*, 444 U.S. 164, 176, 177, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979).

15. *See Barutha v. Prentice*, 189 F.2d 29, 31 (7th Cir.), *cert. denied*, 342 U.S. 841, 72 S.Ct. 69, 96 L.Ed. 635 (1951).

ed against invasion by the courts; it cannot be taken away without due process of law.[16]

An interest may qualify as "property" for some purposes·even though it lacks some of these attributes. For example, an individual can have a "property" right in his job, *see, e. g., Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), so that he cannot be fired without appropriate procedural safeguards; yet the job is not assignable, transferable, descendible, or devisable. The "right to publicity" is transferable during life, *see Haelan Laboratories, supra*, but may not be devisable. *Compare Memphis Development Foundation, supra* (right terminates at death), *with Factors Etc., Inc. v. Pro Arts, Inc., supra* (right may survive death).

Possible revocability is not a destroyer. "Ifs," "maybes," modifiers, and contingencies might negate the concept of property. But we must be certain that the analysis is a pragmatic one, not a theoretical one. So long as an interest is not chimerical, it should fall within the broad reach of the taxing statute.

The word "property" in the statute is not limited in its scope by concepts of property that existed when the estate tax was conceived. When property rights have come into existence since the statute's enactment, the generalized term must be expounded, and the terrain cartographed, by laborers in the fields of law and government. The economy and many of the elements of life today are different than they were even a generation or less ago. The Congress in its wisdom decided to use a general word like property rather than trying to envision what the ingenuity of man would evolve as something substantial. The tax gatherer is directed to seek out the esoterics of ownership and reap his share of an individual's harvest of bundles of rice upon his demise.

The precise question before us is whether "rice acreage history" is "property" for purposes of the estate tax laws. In deciding this question, we start with the basic principle that "unless there is some special reason intrinsic to the particular provision [under consideration] . . ., the general word 'property' has a broad reach in tax law." *DuPont de Nemours & Co. v. United States*, 471 F.2d 1211, 1218, 200 Ct.Cl. 391 (1973). Appellee has presented us with a number of reasons which, it contends, suffice to exclude the value of Babb's "rice history acreage" from his gross estate. We address appellee's contentions in turn.

A.

Appellee contends that on July 4, 1973, the date of Babb's death, Babb had no interest that could be transferred. Appellee is correct that the 1973 allotment was "used up" in that it had already been allocated to certain farms and was absorbed into the rice marketing quota for those farms.[17] However, appellee is not correct that the "current allotment" is "the only thing the producer can deal with or use." Brief for Appellee at 7.

On July 4, 1973, Babb also possessed the "rice history acreage" of his prior production. It is true that this "rice history acreage" was of no further use in 1973, and, as appellee earnestly contends, that Babb had no enforceable right to any specific number of acres of producer rice allotment, or even to *any* future producer rice allotment at all, on the date of his death. It may even be true that, under the Department of Agriculture's regulations, Babb's rice acreage history could not have been transferred on July 4, 1973.[18] Nevertheless, Babb did pos-

---

16. *See* U.S.Const. Amend. V.

17. Rice marketing quotas cannot be transferred between farms. 7 C.F.R. § 730.13 (1973) (repealed).

18. Appellee contends that the United States has conceded this point, but the United States denies having made any such concession, and our review of the record reveals none. The

regulations are not at all clear on the transferability of acreage history in July. As noted earlier, *see* p. 1101 *supra*, the regulations make no provision for the transfer of "rice acreage history" independent of a current year's "producer rice allotment." Appellee interprets this lacuna to mean that "rice acreage history" cannot be transferred independently. Since the "trading season" for producer rice allotments ends on April 1, appellee

sess "rice history acreage," an incorporeal, intangible possession that may or may not have entitled him to receive other rights (specifically, producer rice allotments and farm marketing quotas) in the future.

Appellee relies heavily on *Hudspeth v. United States*, 519 F.2d 1055 (5th Cir. 1975) (per curiam), a case involving the deductibility of a decrease in taxpayer's cotton allotment acreage [19] as a business loss under section 165(a) of the Internal Revenue Code of 1954. *Hudspeth* held that variations in a taxpayer's cotton allotment acreage from year to year do not constitute closed transactions for tax purposes, so that no loss is deductible when a taxpayer's acreage is decreased. *See id.* at 1056. Noting that the

cotton allotment scheme creates a reasonable expectancy that some cotton allotment will be assigned each year but that it neither contemplates, nor creates an enforceable right to, a constant acreage allotment from year to year, the court stated that "from a pure property law standpoint, an allotment carries no vested rights to acreage allotments in future years." *Id.* Appellee relies heavily on this statement.

However, appellee fails to note the succeeding paragraph of the *Hudspeth* opinion, which clearly distinguishes current year crop allotments from production history. "[T]he taxpayers lost no part of their property in 1971. They continued to own during all of 1971 the production history which

contends that any attempt to transfer "rice acreage history" in July would be "null and void, unenforceable and without legal effect." In support of this proposition, appellee cites *McClung v. Thompson*, 401 F.2d 253 (8th Cir. 1968), *Chandler v. David*, 350 F.2d 669 (5th Cir. 1965), *Allen v. David*, 334 F.2d 592 (5th Cir. 1964), *cert. denied*, 379 U.S. 967, 85 S.Ct. 660, 13 L.Ed.2d 560 (1965), and *Williamson v. Holland*, 232 F.Supp. 479 (E.D.N.C.1963). None of these cases supports appellee's position. *McClung, supra*, involved a purported transfer of a farm rice allotment in violation of the regulations then in effect. These regulations were interpreted to prohibit the transfer of a rice allotment from one person to another. The court held that the purported transfer did not operate to transfer the allotment because "to permit owners to enter into an arrangement for the transfer of a crop allotment in disregard of the regulations would be contrary to the general scheme and purpose of the Agricultural Adjustment Act." *McClung, supra*, 401 F.2d at 257. *Chandler, supra*, involved a purported transfer of a cotton allotment to another farmer, despite regulations which only permitted its transfer to other farms owned by the owner of the cotton allotment. *Allen, supra*, held that judicial review of a cancellation of rice acreage allotments and farm marketing quotas was available only under the procedures laid out by the Agricultural Adjustment Act. *Williamson, supra*, involved an action for judicial review of a tobacco acreage allotment which plaintiffs alleged was less than their entitlement under the regulations.

As we interpret these cases, none is inconsistent with the transferability of "rice history acreage." Even if one must comply with the regulations governing the transfer of "producer rice allotments" in order to effectively transfer "rice acreage history," nothing in these four cases is inconsistent with the enforceability of a contract entered into in July which provides

that a producer's "rice acreage history" is transferred to another producer, and that the following winter the transferor producer will take all actions required by the regulations to effectuate the transfer of his following years' rice allotment and all of his rice history acreage to the transferee. To the extent that anything in the regulations is inconsistent with the enforceability of such a contract, the regulations would have to be struck down, since nothing in the statutory scheme contemplates limiting the transferability of "rice history acreage" to certain seasons of the year, and because no administrative goal could be served by holding such a contract unenforceable.

Moreover, even if the regulations can and do effectively limit the transferability of "rice history acreage" to the January through March "trading season," such a restriction on transferability would not necessarily mean that Babb owned nothing of value on the date of his death. Restrictions on transferability, and even absolute prohibitions on transferability for a period of time, may affect the *value* of property, but do not control whether an interest is "property." *See generally Commissioner v. Estate of Pearl Gibbons Reynolds*, 55 T.C. 172 (1970).

**19.** Although the rice and cotton allotment programs have many similarities, we have not studied the cotton allotment program carefully enough to determine whether its provisions are sufficiently similar to those for rice that their tax treatment will always be identical. For present purposes, we are willing to assume that the cases relied upon by appellee involving the tax consequences of cotton allotments are applicable to comparable situations involving rice allotments. *See generally* Westfall, "Agricultural Allotments as Property," 79 Harv.L.Rev. 1180, 1188 (1966).

would entitle their lands to cotton acreage allotments in future years . . . ." *Id.* As we read *Hudspeth*, it supports the position of the United States by recognizing that crop allotment programs create two distinct types of interests: current year acreage allotments and production histories. The former interest creates no vested right which lasts beyond the current year; the latter, however, survives from year-to-year.

### B.

Appellee next contends that "all Babb had when he died was an expectancy that he might receive future allotments if they were issued and if they were issued on the basis of history of production." Brief for Appellee at 16. We cannot accept this contention, because Babb did have a *legally-enforceable right* to receive future allotments if they were issued, if they were issued on the basis of history of production. If rice allotments based on history of production were. issued in a year, and an owner of production history were refused his appropriate allotment, the owner of production history would be able to enforce his rights by a bill in equity.[20] *Cf. Williamson, supra,* 232 F.Supp. at 480 (tobacco allotments enforceable by bill in equity).

The grain of truth in appellee's statement is that an owner of production history has no enforceable right to a continuation of the allotment program or to any specific number of acres of allotment until the national acreage allotment and apportionment factors for a given year are established. Appellee contends that in this situation the value of the expectancy cannot be included in the value of the estate of its owner. It argues that an extensive line of cases dealing with payments made to a named beneficiary or to the estate of a decedent by his employer are controlling.[21] These cases are not relevant here. The leading case cited by appellee is *Dimock v. Corwin,* 19 F.Supp. 56 (E.D.N.Y.1937), *aff'd on other grounds,* 99 F.2d 799 (2d Cir. 1938), *aff'd,* 306 U.S. 363, 59 S.Ct. 551, 83 L.Ed. 763 (1939). As it states, in cases in which an expectancy of a payment to a named beneficiary upon one's death is sought to be included in a decedent's estate, "the precise property of the decedent is asserted to [be] his right . . 'to designate the beneficiary of his death benefit.'" *Id.* at 58. This "right" cannot be sold or assigned by decedent, *see id.* at 59, nor does the "right" pass to the decedent's heirs. The "right" is thus entirely unlike "rice history acreage," which is, as we have noted, transferable, devisable, and descendible.

We find the analogy to the good will of a business to be more apt. No one can seriously doubt that good will is an asset whose value is includable in its owner's estate. *See First National Bank of Memphis v. Henslee,* 74 F.Supp. 106 (M.D.Tenn.1947); *Estate of A. Bluestein,* 15 T.C. 770, 786–88 (1950). Yet good will is an intangible asset which, like "rice history acreage," has value only because it carries the expectancy of receiving future assets of more concrete value. Like "rice history acreage" good will is an asset whose value may evaporate overnight.[22] Like "rice history acreage", good will can be sold or devised. Like "rice history acreage", good will is ordinarily transferred along with other assets (in the

---

**20.** The statutory review scheme, 7 U.S.C.A. § 1361–68 (West 1973) actually allows review of farm marketing quotas rather than the allotments themselves. As we noted earlier, however, *see* p. 1099 *supra,* the allotment itself has no utility other than entitling its holder to a marketing quota.

**21.** *Estate of Bogley,* 514 F.2d 1027 (Ct.Cl.1975); *In re Wadewitz Estate,* 339 F.2d 980 (7th Cir. 1964); *Garber's Estate v. Commissioner,* 271 F.2d 97 (3rd Cir. 1959); *Charleston National Bank v. United States,* 221 F.Supp. 271 (S.D.W. Va.1963); *Worthen v. United States,* 192 F.Supp. 727 (D.C.Mass.1961); *Beaver Trust Co. v. United States,* 184 F.Supp. 553 (W.D.Pa. 1960); *Molter v. United States,* 146 F.Supp. 497 (E.D.N.Y.1956); and *Dimock v. Corwin,* 19 F.Supp. 56 (E.D.N.Y.1937), *aff'd on other grounds,* 99 F.2d 799 (2d Cir. 1938), *aff'd,* 306 U.S. 363, 59 S.Ct. 551, 83 L.Ed. 763 (1939).

**22.** In fact, good will may be even more evanescent, because its value depends on customers and market forces, whereas "rice history acreage" retains its value unless Congress modifies the rice allotment program.

case of good will, a business; in the case of rice acreage history, a rice farm).[23]

Moreover, such expectancies as a right to compensation under a contingent fee contract, see *Duffield v. United States*, 136 F.Supp. 944 (E.D.Pa.1955), and a promise to return property to an estate if other property is insufficient to meet the estate's tax obligations, see *Welch v. Hall*, 134 F.2d 366 (1st Cir. 1943), have been held to be "property" includable in a decedent's estate. "Rice history acreage" is no less certain an interest than these.[24]

### C.

Appellee also contends that the value of Babb's rice acreage history cannot be included in his estate because neither Babb nor his executor could control the transfer of the rice acreage history after Babb's death. The rice acreage history does not pass by will or by the laws of descent, appellee argues, but under the statute and regulations to those who continue his farming operations. See 7 U.S.C.A. § 1353(f)(1) (West 1973) (suspended); 7 C.F.R. § 730.-76(b)(1) (1973) (repealed), supra n. 9. However, it is undeniable that Babb's farms, including his rice farming operations, could pass either by testamentary bequest or by descent, and that in fact they passed under his will. His rice acreage history passed, along with his rice operations, to the persons he desired to inherit both.

Appellee may be attempting to emphasize the fact that an attempted testamentary transfer of rice acreage history along with the farming operations will be ineffective unless the heirs or devisees "furnish the county committee in writing . . . the names and addresses of the heirs or devisees and the extent each will continue the farming operations of the deceased." 7 C.F.R. § 730.76(b)(1) (1973) (repealed). We attach no estate tax significance to the fact that the heirs or devisees must file a piece of paper with the county committee to establish their rights.

We also fail to find convincing appellee's strained attempt to analogize "rice history acreage" to an interest created after death, like a cause of action for wrongful death, see *Connecticut Bank & Trust Co. v. United States*, 465 F.2d 760 (2d Cir. 1972), or to Social Security survivors' benefits, see Rev. Rul. 67-277, 1967-2 C.B. 322. We note the crucial distinction that neither a cause of action for wrongful death nor Social Security survivors' benefits can ever be transferred by a decedent prior to his death. Each of these interests is "created" only upon a decedent's death, whereas Babb possessed rice acreage history prior to his death.

### IV. *Conclusion*

"Rice acreage history" is not only devisable and descendible, but also transferable *inter vivos*. Those heirs who inherited Babb's rice farming operations, by filing the requisite document with the county commission, were able to retain possession of the "rice history acreage" possessed by Babb the moment before his death. They could have converted the value of the rice acreage history into cash by selling it to others by early 1974, if not earlier.[25] When an interest possesses these attributes, there can be no doubt that its value must be included in the owner's estate, for the focus

---

**23.** In "farm" states, the rice production history "attaches" to the farm on which the rice is grown. *See* n. 5 *supra*. If the farm's owner dies, there can be no doubt that the value of this acreage history, which would be included as part of the fair market value of the farm, would be includable in the owner's estate. We fail to see why the different method of allotment used in "producer" states should mandate different estate tax consequences.

**24.** *Cf. Parmelee Transportation Co. v. United States*, 351 F.2d 619, 624 (Ct.Cl.1965) (century-long business arrangement which could not be

enforced by taxpayer held to be "property" for purpose of I.R.C. § 165); *Radio Station WBIR, Inc.*, 31 T.C. 803, 813 (1959) (expenditures incurred in application for television license were expended in the acquisition of property constituting a capital asset for purpose of I.R.C. § 263, despite fact that license is not vested right); *Elston Co. v. United States*, 21 F.Supp. 267 (Ct.Cl.1937) (saloon renewal right was property interest under predecessor of I.R.C. § 1012).

**25.** *See* n. 18 *supra*.

of the estate tax is on the passage of an interest at death.

Because the court below erred in holding that the value of Babb's "rice history acreage" could not be included in the value of his estate, we must reverse the grant of summary judgment on this point. In remanding for a determination of the value of Babb's "rice acreage history," we caution that the value of the "rice acreage history" must be separated from the value of a rice allotment for a year. Babb's 1973 rice allotment had been "used up" and its value had merged with that of the growing crops. However, on the date of his death, Babb also possessed "rice history acreage." The value of his "rice history acreage" was properly includable in his gross estate.

In early 1973, rice allotments and related production history were traded in Texas at prices in the vicinity of $200 to $300 per acre. This price included both (a) the right to market a quantity of rice in 1973 free from the penalty tax, and (b) the right to be considered for any rice allotments granted in years 1974–78 on the basis of the seller's history of production, for so long as the rice allotment program continued. On remand, the court must separate the value of the interests which were traded into these two parts to determine the value of the second part ("rice history acreage") for inclusion in the value of Babb's estate. Although the fair market value of production history may properly reflect a discount because of any uncertainties surrounding the continuation of the rice allotment program, these uncertainties were already reflected in the market price of the combined allotments and related history which were traded in early 1973. Thus, once the fair market value of the combined interests in early 1973 is determined, and the value of the right to market rice in 1973 is subtracted, the only further discount that should be necessary is to allow for any new uncertainties concerning the future of the rice allotment program which arose between the 1973 rice allotment trading season and July 4, 1973. Of course, any such uncertainties

must be evaluated as they would have appeared to the market on July 4, 1973, rather than through hindsight.

REVERSED and REMANDED.